State of Maryland v. Harold Albert Norton, Jr., No. 67, Sept. Term 2014, Opinion by Battaglia, J.

**CONSTITUTIONAL CRIMINAL PROCEDURE – CONFRONTATION CLAUSE – FORENSIC REPORTS**

Inclusion of the language "within a reasonable degree of scientific certainty" in a Forensic DNA Case Report rendered the Report testimonial within the meaning of *Williams v. Illinois*, 567 U.S. __, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), such that its admission into evidence required the testimony of the analyst who had performed the DNA testing and authored the Report.

Circuit Court for Baltimore County,
Maryland
Case No. 03-K-07-4807, 06-3659
Argued: April 8, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 67
September Term, 2014

STATE OF MARYLAND
v.
HAROLD ALBERT NORTON, JR.

Barbera, C.J.
*Harrell
Battaglia
Greene
Adkins
McDonald
Watts

Opinion by Battaglia, J.
Harrell, J., joins in judgment only.

Filed:   July 9, 2015

*Harrell, J., participated in the hearing of
the case, in the conference in regard to
its decision and in the adoption of the
opinion but he retired from the Court
prior to the filing of the opinion.

This case presents us with the question of whether a Forensic DNA Case Report, not executed under the penalty of perjury, but containing the language of "within a reasonable degree of scientific certainty", was testimonial within the meaning of *Williams v. Illinois*, 567 U.S. __, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012).

The testimonial issue was queued up when DNA was found on a mask that, according to witnesses, had been used in a robbery; the mask later was identified as potentially belonging to Harold Norton, Jr.[1] A small piece of the mask that contained saliva, from which a DNA sample was extracted, was sent to The Bode Technology Group, Inc., a commercial DNA testing company, "based" in Wharton, Virginia, along with a buccal swab[2] obtained from Norton for DNA comparison.

An analyst at Bode Technology created and executed a Forensic DNA Case Report, which was comprised of three pages on the lab's letterhead addressed to the Baltimore County Police Department, which contained the results of her comparison of a "'buccal swab from suspect Harold Norton'" and a "'cutting from ski mask[']". On the second page, above her signature, the analyst documented her ultimate conclusion, that "within a

---

[1] The mask was received in evidence as State's Exhibit 9A.

[2] "A buccal sample is obtained by swabbing the cheek area inside of a person's mouth." *Derr v. State*, 434 Md. 88, 99 n.6, 73 A.3d 254, 260 n.6 (2013) ("*Derr II*") (internal quotation marks omitted).

reasonable degree of scientific certainty, Harold Norton (2S06-062-01) is the major source

of the biological material obtained from [the mask]". The Report reflected the following:[3]

[First page]

**Bode Technology**
10430 Furnace Road
Lorton, VA 22079
Phone 703-644-1200

**Forensic DNA Case Report**
September 28, 2006

To:           BODE Case#: 2S06-062
Laura Pawlowski      Agency Case#: 06-188-1852 / 06-4567
Baltimore County Police Department
Forensic Services
700 East Joppa Road
Towson, MD 21286

List of Evidence Received on August 29, 2006 for DNA analysis:

| BODE # | Agency ID | Description |
|---|---|---|
| 2S06-062-01 | 3521-001.1 | Labeled as "buccal swab from suspect Harold Norton" |
| 2S06-062-02 | 4257-010.1 | Labeled as "cutting from ski mask (+amylase phadebas dark blue)" |

**CASE REVIEW AND RESULTS:**

The items listed above were processed for DNA typing by analysis of the 13 CODIS Short Tandem Repeat (STR) loci and the gender determination locus, Amelogenin. Appropriate positive and negative controls were used concurrently throughout the analysis. The results of the analysis are summarized in **Table 1.**

1. A mixed DNA profile was obtained from evidence item 2S06-062-02.
2. A complete DNA profile was obtained from reference item 2S06-062-01.

---

[3] Page three of the Report contains only "Table 1: Summary of Short Tandem Repeat Results" and has been omitted herein.

The DNA profiles reported in this case were determined by procedures that have been validated according to standards established by the Scientific Working Group on DNA Analysis Methods (SWGDAM) and adopted as Federal Standards.

[Second page]

BODE Case #: 2S06-062                              Date: September 28, 2006
Agency Case#: 06-188-1852 / 06-4567

CONCLUSIONS AND STATISTICS:

1.  The DNA profile that was obtained from evidence item 2S06-062-02 is a mixture that includes a major component male DNA profile. The major component male DNA profile matches the DNA profile obtained from the reference item from Harold Norton (2S06-062-01).

The probability of randomly selecting an unrelated individual with this DNA profile is:

        1 in 900 Quintillion (1 in 9.0 X $10^{20}$) from the Caucasian population;
        1 in 1.5 Quintillion (1 in 1.5 X $10^{18}$) from the African American population;
        1 in 18 Quintillion (1 in 1.8 X $10^{19}$) from the SW Hispanic population;
        1 in 27 Quintillion (1 in 2.7 X $10^{19}$) from the SE Hispanic population.

**Therefore, within a reasonable degree of scientific certainty, Harold Norton (2S06-062-01) is the major source of the biological material obtained from evidence item 2S06-062-02.**

The evidence and extracts will be returned to the Baltimore County Police Department.

Report submitted by:

_____/s/_____                              _____/s/_____
Rachel E. Cline, MFS                              Susan Bach, MFS
DNA Analyst III                                   Forensic Casework Manager

(emphasis added to conclusion).

3

Norton's first trial in which he was charged with armed robbery ended in a mistrial. During a second trial,[4] the State attempted to introduce the Forensic DNA Case Report into evidence through the testimony of a Bode Technology supervisor, without calling the analyst who had authored and signed the Report. The supervisor testified, ultimately, that he had "reviewed all the materials, all of the notes, the lab notes, all of the data that was generated, the paperwork and the final report."

Before the Report was admitted, however, Norton's counsel raised two issues, one of which related to discovery, which is not before us. The other objection forms the gravamen of the present dispute—that the Confrontation Clause would be violated were the Report to be admitted under the umbrella of the testimony of the supervisor, because the original analyst, then, could not be cross-examined. The State retorted that Norton had waived the objection, because his counsel had stipulated to the Report's admissibility during the first trial. At the second trial, the Report *was* admitted as State's Exhibit 10A.

Norton appealed to the Court of Special Appeals.[5] In an unreported opinion, our intermediate appellate court held that admission of the Report without the analyst's testimony violated Norton's ability to confront his accuser under *Derr v. State*, 422 Md.

---

[4] In addition to armed robbery, Norton was also charged with attempted second degree murder, witness intimidation and lesser offenses, for which he had been indicted in 2007.

[5] The questions before the intermediate appellate court were:
I.   Was [he] denied his constitutional, Sixth Amendment right of confrontation and cross-examination of Rachel Kline?
II.  Was it error to grant the State's motion for joinder of charges?

211, 29 A.3d 533 (2011) ("*Derr I*").[6]  *Norton v. State*, No. 2382, slip op. at 13-15 (Md. App. Nov. 21, 2011) ("*Norton I*").  Subsequently, the Supreme Court granted *certiorari* in *Derr I* and ultimately vacated its mandate in light of *Williams v. Illinois*, 567 U.S. __, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), and remanded the case to us for further proceedings.  *Maryland v. Derr*, __ U.S. __, 133 S.Ct. 63, 183 L.Ed.2d 700 (2012).

In *Derr II*, after having heard arguments, we concluded that the three exhibits in issue that identified Derr as the source of DNA found on the victim, about which testimony had been elicited from someone other than the analyst, had not violated Derr's right of confrontation.  *Derr v. State*, 434 Md. 88, 118-20, 73 A.3d 254, 272-73 (2013) ("*Derr II*").  There was no Confrontation Clause violation, we held, because the exhibits, one of which contained the analyst's bench notes while the others were DNA profiles consisting only of "a series of numbers and lines", "[were] neither a sworn nor a certified declaration of fact" and, thus, were not "testimonial".  *Id.* at 119, 73 A.3d at 272 (internal quotation marks omitted).

---

[6] In *Derr I*, we reversed Derr's conviction, because we determined that the exhibits at issue were testimonial under *Melendez-Diaz* and *Bullcoming*.  422 Md. 211, 216, 29 A.3d 533, 536-37 (2011).  The reports were testimonial, we said, because they contained solemn declarations of fact, reflected the functional equivalent of in-court testimony, and were prepared for later use at trial.  We concluded, moreover, that admitting the documents only as the basis for the conclusion of the testifying expert who had not performed nor witnessed the analysis offended the Confrontation Clause, because the exhibits contained the conclusions of other analysts.

In light of *Derr II*, we vacated *Norton I*[7] and remanded it to the Court of Special Appeals for further proceedings. *State v. Norton*, 435 Md. 322, 77 A.3d 1116 (2013) (per curium). In a reported opinion, our intermediate appellate court once again reversed Norton's conviction, holding that Norton's right of confrontation was violated when the Circuit Court admitted the Report without the analyst's testimony. *Norton v. State*, 217 Md. App. 388, 390, 94 A.3d 110, 111 (2014) ("*Norton II*"). We granted the State's petition for *certiorari* to consider the following question:

> Did the Court of Special Appeals err in determining that Norton's right to confrontation under the federal constitution was violated where a DNA expert testified regarding the work of another DNA analyst, and that expert was a supervisor in the same lab, reviewed the work of the other analyst, and came to his own conclusion that was consistent with the conclusion of the other analyst, but the analyst herself did not testify?

*State v. Norton*, 440 Md. 114, 99 A.3d 778 (2014).

We shall hold that the language "within a reasonable degree of scientific certainty" in the Forensic DNA Case Report rendered the Report testimonial within *Williams*, 567 U.S. __, 132 S.Ct. 2221, 183 L.Ed.2d 89.

Our analysis regarding the admission of a forensic document absent the testimony of its author begins with *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158

---

[7] We granted *certiorari* in *Norton I* on October 21, 2013. 435 Md. 266, 77 A.3d 1084 (2013). The question presented at that time was:

> Did the Court of Special Appeals err in determining that Norton's right to confrontation under the federal constitution was violated where a DNA expert testified regarding the work of another DNA analyst, and that expert was a supervisor in the same lab, reviewed the work of the other analyst, and came to his own conclusion that was consistent with the conclusion of the other analyst, but the analyst herself did not testify?

6

L.Ed.2d 177 (2004).[8]  In *Crawford*, Justice Antonin Scalia, writing for the Court, explored the history of the Sixth Amendment Right of Confrontation;[9] he concluded that the Clause was an attempt to eviscerate the "use of *ex parte* examinations as evidence against the accused".  *Id.* at 50, 124 S.Ct. at 1363, 158 L.Ed.2d at 192.  As such, "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  *Id.* at 53-54, 124 S.Ct. at 1365, 158 L.Ed.2d at 194.

Justice Scalia's analysis in *Crawford* was steeped in the history of England, which, two centuries before the Revolution, according to Justice Scalia, began to incorporate "elements of the civil-law practice" of continental Europe into its "common-law tradition."[10]  *Id.* at 43, 124 S.Ct. at 1359, 158 L.Ed.2d at 187-88.  One such practice was

---

[8] The Supreme Court, in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), "rewrote confrontation clause analysis".  6A Lynn McLain, *Maryland Evidence—State and Federal* § 800:5 (3d ed. 2013).

[9] The Sixth Amendment to the United States Constitution provides, in pertinent part:
    In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him;
The Sixth Amendment was incorporated against the States through the Fourteenth Amendment in *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923, 926 (1965) ("We hold today that the Sixth Amendment's right of an accused to confront the witnesses against him is likewise a fundamental right and is made obligatory on the States by the Fourteenth Amendment.").

[10] The terms "civil law" and "common law" refer to the legal system of continental Europe and that of England, respectively, that concurrently emerged during the Middle Ages. *The Common Law and Civil Law Traditions*, The Robbins Collection 1 (2010), https://www.law.berkeley.edu/library/robbins/pdf/CommonLawCivilLawTraditions.pdf
(continued . . . )

7

to allow justices of the peace to examine suspects and witnesses before criminal trials, such that the results of the examination would, at times, be read in court, without hearing from the witness at trial. *Id.* at 43, 129 S.Ct. at 1359, 158 L.Ed.2d at 188. Justice Scalia observed that the practice of receiving *ex parte* statements of accusers at the trial of the accused in English courts "'occasioned frequent demands by the prisoner to have his 'accusers,' *i.e.* the witnesses against him, brought before him face to face.'" *Id.*, quoting 1 J. Stephen, History of the Criminal Law of England 326 (1883).

As Justice Scalia continued to review English history with respect to the Confrontation Clause, he noted that *ex parte* pretrial examinations had become routine during the sixteenth century reign of Queen Mary.[11] *Id.* at 43, 124 S.Ct. at 1360, 158 L.Ed.2d at 188. Justices of the peace were appointed pursuant to then-enacted bail and committal statutes to examine suspects and witnesses in felony cases and certify the

---

( . . . continued)
(last visited July 7, 2015). Common law systems, most recognizable in American and British law, rely on an adversarial contest between two parties, which is moderated by a judge, with a jury of citizens who are not trained in the law deciding the facts. *Id.* The judge in a common law system then determines an appropriate sanction based on the jury's verdict. *Id.* In contrast, a judge in a civil law system ordinarily "brings the formal charges, investigates the matter, and decides on the case [while] work[ing] within a framework established by a comprehensive, codified set of laws." *Id.*

[11] The coronation of Queen Mary occurred on October 1, 1553. John Edwards, Mary I, England's Catholic Queen 123 (2011). She reigned until her death on November 17, 1558. *Id.* at 332.

8

results to the court; the certifications were used as evidence at trial.[12] *Id.* at 44, 124 S.Ct. at 1360, 158 L.Ed.2d at 188. One of the most notorious, and reviled, instances of the use of the civil law judicial examination procedure in an English court, Justice Scalia observed, occurred during the trial of Sir Walter Raleigh for treason in 1603. *Id.* at 44, 124 S.Ct. at 1360, 158 L.Ed.2d at 188.

According to Justice Scalia, an *ex parte* examination of Sir Walter Raleigh's alleged accomplice, Lord Cobham, was read to the jury during Sir Walter Raleigh's trial, at which Lord Cobham did not appear. *Id.* Sir Walter Raleigh had demanded that the judges adhere to the common law tradition of allowing the accused to examine the witnesses against him in court: "'[t]he Proof of the Common Law is by witness and jury: let Cobham be here, let him speak it. Call my accuser before my face . . . .'" *Id.*, quoting 2 How. St. Tr., at 15-16. The judges refused, and Sir Walter Raleigh was convicted and sentenced to death.[13] *Id.*

Justice Scalia described the statutory and judicial reforms that developed following Sir Walter Raleigh's trial in order to limit the use of *ex parte* examinations. *Id.* Treason statutes, for example, required witnesses to confront the accused at arraignments; meanwhile, courts developed strict rules of unavailability and admitted *ex parte*

---

[12] *Cf. Crawford*, 541 U.S. at 44, 124 S.Ct. at 1360, 158 L.Ed.2d at 188 ("It is doubtful that the original purpose of the examinations was to produce evidence admissible at trial.").

[13] "One of Raleigh's trial judges later lamented that 'the justice of England has never been so degraded and injured as by the condemnation of Sir Walter Raleigh.'" *Crawford*, 541 U.S. at 44, 124 S.Ct. at 1360, 158 L.Ed.2d at 188.

9

examinations only if the witness was demonstrably unable to testify in person. *Id.* at 44-45, 124 S.Ct. at 1360, 158 L.Ed.2d at 188. Toward the end of the seventeenth century, in response to a recurring question of whether an accused should be afforded the opportunity to cross-examine witnesses against him, the Court of the King's Bench answered in the affirmative, ruling that, "even though a witness was dead, his examination was not admissible where 'the defendant not being present when [it was] taken before the mayor . . . had lost the benefit of a cross-examination.'" *Id.* at 45, 124 S.Ct. at 1360-61, 158 L.Ed.2d at 189, quoting *King v. Paine*, 5 Mod. 163, 165, 87 Eng. Rep. 584, 585 (1696).

Justice Scalia then reviewed the practices embraced by the English in pre-revolutionary America, which continued the civil law tradition of *ex parte* examinations; the Governor of Virginia, for example, "'privately issued several commissions to examine witnesses against particular men *ex parte*'", which was met by protests from the Virginia Council advocating for the common law approach of permitting the accused "'to be confronted with, or defend himself against his defamers.'" *Id.* at 47, 124 S.Ct. at 1362, 158 L.Ed.2d at 190, quoting A Memorial Concerning the Maladministrations of His Excellency Francis Nicholson, *reprinted in* 9 English Historical Documents 253, 257 (D. Douglas ed. 1955). The purview of admiralty courts, which followed civil law, was extended to offenses arising under the Stamp Act so that testimony by private judicial examination from witnesses against accused colonists was admitted into evidence without cross-examination. *Id.* at 47-48, 124 S.Ct. at 1362, 158 L.Ed.2d at 190.

Justice Scalia opined that in reaction to the use of such *ex parte* examinations the declarations of rights adopted by many of the colonies around the time of the Revolution guaranteed a right of confrontation. *Id.* at 48, 124 S.Ct. at 1362, 158 L.Ed.2d at 191, citing, *inter alia*, Maryland Declaration of Rights § XIX (1776).[14] The absence of a comparable right in the proposed Federal Constitution, Justice Scalia continued, garnered objections during the Massachusetts ratifying convention[15] from those who criticized the use of *ex parte* examinations as evidence during trial. *Id.* In response, the Bill of Rights included in its Sixth Clause the language, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him". *Id.* at 49, 124 S.Ct. at 1363, 158 L.Ed.2d at 191; U.S. Const. amend. VI.

From this historical perspective, Justice Scalia extrapolated that the Confrontation Clause embodied two essential premises: "First, the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused"; and,

---

[14] Section Nineteen of the Maryland Declaration of Rights of 1776 provided, in relevant part:
> That, in all criminal prosecutions, every man hath a right . . . to be confronted with the witnesses against him;

The same language is now memorialized in Article Twenty-One of the Maryland Declaration of Rights.

[15] From January 9 to February 7, 1788, over three hundred delegates from Massachusetts convened to consider whether the commonwealth should ratify the United States Constitution. Gregory E. Maggs, *A Concise Guide to the Records of the State Ratifying Conventions As A Source of the Original Meaning of the U.S. Constitution*, 2009 U. Ill. L. Rev. 457, 468, 472 (2009). During the debates, Anti-Federalists strongly objected to ratification, because the proposed constitution lacked a bill of rights. *Id.* at 472.

11

second, "that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 50, 53-54, 124 S.Ct. at 1363, 1365, 158 L.Ed.2d at 192, 194.

Deducing that the Framers intended, by the adoption of the mandate of the Confrontation Clause, to eliminate the use of civil law *ex parte* examinations at the trial of the accused, Justice Scalia concluded that the Clause adheres when "testimonial hearsay" is being introduced at trial. *Id.* at 53, 124 S.Ct. at 1365, 158 L.Ed.2d at 194. Justice Scalia posited that the text of the Confrontation Clause reflected such a focus, because "witnesses", as used therein, served to restrict the use of statements from those who "bear testimony". *Id.* at 51, 124 S.Ct. at 1364, 158 L. Ed. 2d at 192. To "bear testimony", Justice Scalia continued, involves making "'[a] solemn declaration or affirmation . . . for the purpose of establishing or proving some fact'", (*id.*, quoting 2 N. Webster, An American Dictionary of the English Language (1828)); therefore, the "primary object" of the Confrontation Clause is to limit the unfettered use of a statement made for the purpose of establishing a fact against the accused at trial, which Justice Scalia termed "testimonial hearsay". *Id.* at 53, 124 S.Ct. at 1365, 158 L.Ed.2d at 194.

In *Crawford*, Justice Scalia's application of the testimonial tenets gleaned from the historical analysis yielded a conclusion that a wife's statements implicating her husband made during a police interrogation were testimonial and inadmissible without the wife's presence as a witness at trial. *Id.* at 65-68, 124 S.Ct. at 1372-74, 158 L.Ed.2d at 201-03. The *Crawford* case had evolved from a Washington trial court judge permitting the

introduction of the wife's statements, without her presence, because the "questioner [was] neutral to her".  *Id.* at 66, 124 S.Ct. at 1373, L.Ed.2d at 202 (internal quotation marks and alterations omitted).  Although the Washington Court of Appeals reversed the trial court, the Washington Supreme Court vacated the opinion of its intermediate appellate court and reinstated Crawford's conviction.  *Id.* at 41, 124 S.Ct. at 1358, 158 L.Ed.2d at 186.

The United States Supreme Court reversed, because, as Justice Scalia recounted, "[t]he Framers would be astounded to learn that *ex parte* testimony could be admitted against a criminal defendant because it was elicited by 'neutral' government officers." *Id.* at 66, 124 S.Ct. at 1373, 158 L.Ed.2d at 202.  Justice Scalia opined that the situation at issue bore the "closest kinship" to the admission of the results of *ex parte* examinations at trial, because the justices of the peace who conducted examinations under the bail and committal statutes enacted during the reign of Queen Mary "had an essentially investigative and prosecutorial function" and, therefore, bore a strong resemblance to the police officers of the present day.  *Id.* at 53, 124 S.Ct. at 1365, 158 L.Ed.2d at 193-94. The wife's statements, in Justice Scalia's calculus, were, therefore, testimonial in any sense of the term.  *Id.* at 53, 124 S.Ct. at 1365, 158 L.Ed.2d at 194.

The *Crawford* holding, then, that testimonial hearsay is inadmissible at trial without the accused having had the opportunity to cross-examine is foundational.  Justice Scalia, however, did not define "testimonial" nor identify its parameters.  What we do know is "that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the

13

defendant had had a prior opportunity for cross-examination." *Id.* at 53-54, 124 S.Ct. at 1365, 158 L.Ed.2d at 194.

A number of inquiries can be derived from *Crawford*, however, to determine whether hearsay would be considered "testimonial". To whom the statement is made is a key component, because the involvement of a government official, or one acting on the government's behalf, is strongly associated with what Justice Scalia emphasized as the "core concern" of the Confrontation Clause, (*id.* at 53, 124 S.Ct. at 1365, 158 L.Ed.2d at 193-94); the involvement of government officers, Justice Scalia explained, "presents unique potential for prosecutorial abuse . . . with which the Framers were keenly familiar." *Id.* at 56 n.7, 124 S.Ct. at 1367 n.7, 158 L.Ed.2d at 196 n.7.

Another inquiry would involve whether the statement had been solicited and, if so, whether the solicitation occurred under circumstances that "would lead an objective witness reasonably to believe that the statement would be available for use at a later trial". *Id.* at 52, 124 S.Ct. at 1364, 158 L.Ed.2d at 193 (describing various valid formulations of "testimonial") (internal quotation marks omitted). Such an inquiry is consistent with *Crawford*'s focus on the trial of Sir Walter Raleigh, which made clear that *ex parte* statements solicited as part of a criminal investigation or prosecution are the archetypal statements that demand confrontation. *Id.* at 44, 124 S.Ct. at 1360, 158 L.Ed.2d at 188.

Yet another question involves whether, when viewed objectively, the challenged statement was made "for the purpose of establishing or proving some fact" in a criminal prosecution or investigation. *Id.* at 51, 124 S.Ct. at 1364, 158 L.Ed.2d at 188. Justice

14

Scalia drew a sharp distinction between hearsay made as part of a routine business practice, as part of a casual conversation or to further a criminal conspiracy with hearsay made in order to establish an individual's role in the commission of a criminal act.[16] *Id.* at 51-52, 124 S.Ct. at 1364, 158 L.Ed.2d at 193. When a statement, then, is made for a non-prosecutorial purpose, it is less likely to be testimonial than one created as part of an ongoing criminal investigation. *Id.*

Another query from *Crawford* is whether the statement under scrutiny was made in a formal context. During Justice Scalia's textual analysis of the Confrontation Clause, he noted that a testimonial statement is one that is "formal", and a "core class" of such declarations is one contained within an affidavit, deposition, prior testimony or confession. *Id.* at 51-52, 124 S.Ct. at 1364, 158 L.Ed.2d at 193. As such, an inquiry with respect to formality may turn on the form of the statement as well as other circumstances involving the creation of the statement, such as if it was offered in the confines of a police interview room. *See id.* at 52-53, 124 S.Ct. at 1364-65, 158 L.Ed.2d at 193-94.

A final inquiry involves whether there is historical authority for the admission of the challenged statement, despite its testimonial nature. Justice Scalia reflected upon at least two situations in which such historical precedent exists: when the statement is a dying declaration as that term is understood by the rules of evidence pertaining to

---

[16] Justice Scalia specifically described business records and statements in furtherance of a conspiracy as hearsay, but not testimonial and, therefore, outside the purview of the Confrontation Clause, because such statements are not created for the purpose of a criminal prosecution or investigation. *Crawford*, 541 U.S. at 56, 124 S.Ct. at 1367, 158 L.Ed.2d at 196-97.

hearsay, (*id.* at 56 n.6, 124 S.Ct. at 1367 n.6, 158 L.Ed.2d at 195 n.6), and when the witness is unavailable due to the wrongdoing of the defendant, (*id.* at 62, 124 S.Ct. at 1370, 158 L.Ed.2d at 199).

Following *Crawford*, refining what is "testimonial" has been the gravamen of a number of Supreme Court cases, most notably for our analysis, *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009); *Bullcoming v. New Mexico*, 564 U.S. __, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011); and *Williams v. Illinois*, 567 U.S. __, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012).

In *Melendez-Diaz*, Melendez-Diaz was charged with distributing cocaine. 557 U.S. at 308, 129 S.Ct. at 2530, 174 L.Ed.2d at 320. During trial, three "certificates of analysis" were received in evidence,[17] which contained the results of forensic testing

---

[17] The three reports received in evidence were identical in form, which appeared as follows, followed by an attestation by a notary public, which we have omitted:

The Commonwealth of Massachusetts
Executive Office of Health and Human Services
Department of Public Health
State Laboratory Institute
305 South Street
Boston, MA 02130-3597
617-983-6622

**DATE RECEIVED**: 11/19/2001
**DATE ANALYZED**: 11/28/2001

**No.** 615742
**I hereby certify that the** substance
**Contained in** 2 plastic bags          **MARKED**: 615742
**Submitted by** P.O. FRANK MCDONOUGH of the BOSTON POLICE DEPT.

**Has been examined with the following results**:

(continued . . . )

16

performed by a state laboratory in response to a police request as required by Massachusetts law. *Id.* at 308, 129 S.Ct. at 2531, 174 L.Ed.2d at 320. The technicians who had performed the testing swore to the results of their testing before a notary public. *Id.*

Melendez-Diaz was convicted and the Massachusetts intermediate appellate court affirmed. *Id.* at 309, 129 S.Ct. at 2527, 174 L.Ed.2d at 320. The State Supreme Judicial Court denied review, but the United States Supreme Court granted *certiorari* and reversed, holding that the laboratory certificates fell "within the 'core class of testimonial statements'" and, therefore, were inadmissible. *Id.* at 310, 129 S.Ct. at 2532, 174 L.Ed.2d at 321, quoting *Crawford*, 541 U.S. at 51-52, 124 S.Ct. at 1364, 158 L.Ed.2d at 193. Justice Scalia, again writing for the majority, emphasized the formality of the exhibits as indicative of their testimonial nature. *Id.* at 311, 129 S.Ct. at 2532, 174 L.Ed.2d at 321. He noted that, although denominated as "certificates", the exhibits were "quite plainly affidavits" in that they were declarations of fact sworn to by the declarant before an officer authorized to administer oaths and, therefore, the documents fell within

---

( . . . continued)
    The substance was found to contain:
    Cocaine, a derivative of Coca leaves, as defined in Chapter 94 C,
    Controlled Substance Act, Section 31, Class B.

    **NET WEIGHT**: 2.41 grams
    **DEFENDANT**: MONTERO, ELIS A. ET AL
    _____/s/_____/s/_____
    Assistant Analysts   Della Saunders         Michael Lawler
The two other reports varied with respect only to the amount "Contained" and the specimen's "NET WEIGHT".

the "core class" of testimonial statements. *Id.* at 310, 129 S.Ct. at 2532, 174 L.Ed.2d at 321.

The second point of emphasis, Justice Scalia observed, was that the reports were created specifically to resolve a fact in question, "that the substance found in the possession of Melendez-Diaz . . . was, as the prosecution claimed, cocaine". *Id.* The sole purpose of the certificates, Justice Scalia opined, was to provide evidence to be used at trial against Melendez-Diaz and, therefore, it was clear that he should have been afforded an opportunity to cross-examine the analysts who created the certificates. *Id.* at 311, 129 S.Ct. at 2532, 174 L.Ed.2d at 321. In essence, the certificates were functionally identical to live testimony and were created to do "'precisely what a witness does on direct examination.'" *Id.*, quoting *Davis v. Washington*, 547 U.S. 813, 830, 126 S.Ct. 2266, 2278, 165 L.Ed.2d 224, 242 (2006).

Justice Scalia then rejected a number of arguments raised by the State, (*id.* at 313-28, 129 S.Ct. at 2533-42, 174 L.Ed.2d at 323-32), and, in so doing, refined "testimonial hearsay" as it pertains to forensic documents. He opined that a voluntary statement could be testimonial, thereby rejecting the State's argument to the contrary. *Id.* at 316-17, 129 S.Ct. at 2535, 174 L.Ed.2d at 325. Justice Scalia continued that, even were an inquiry from the police to be required for a statement to be testimonial, the fact that investigators had requested the analysis of the substance found in Melendez-Diaz's possession was a sufficient:

> As we have explained, "[t]he Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed

interrogation." *Davis, supra,* at 822-823, n. 1. Respondent and the dissent cite no authority, and we are aware of none, holding that a person who volunteers his testimony is any less a "'witness against' the defendant," Brief for Respondent 26, than one who is responding to interrogation. In any event, the analysts' affidavits in this case *were* presented in response to a police request. See Mass. Gen. Laws, ch. 111, §§ 12-13. If an affidavit submitted in response to a police officer's request to "write down what happened" suffices to trigger the Sixth Amendment's protection (as it apparently does, see *Davis,* 547 U.S., at 819-820; *id.,* at 840, n. 5 (THOMAS, J., concurring in judgment in part and dissenting in part)), then the analysts' testimony should be subject to confrontation as well.

*Id.* at 316-17, 129 S.Ct. at 2535, 174 L.Ed.2d at 325.

The later case of *Bullcoming v. New Mexico,* 564 U.S. __, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), represents the next refinement of the word testimonial in the context of a forensic document. More specifically, the question addressed in *Bullcoming* was "whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." *Id.* at__, 131 S.Ct. at 2710, 180 L.Ed.2d at 616. The issue had arisen during Bullcoming's trial for aggravated driving while intoxicated, when the State failed to call the analyst from the Scientific Laboratory Division of the New Mexico Department of Health who had quantified Bullcoming's blood alcohol concentration level. *Id.* The sample had been forwarded to the Laboratory along with information that Bullcoming was stopped and arrested because of an accident. *Id.* The analyst recorded the results onto "a standard [Scientific Laboratory Division] form titled 'Report of Blood Alcohol Analysis'" and

certified[18] that Bullcoming's blood alcohol concentration was above the threshold for supporting a charge of aggravated driving while intoxicated.[19] *Id.* at __, 131 S.Ct. at 2710, 2711, 180 L.Ed.2d at 616, 617. The Report was offered as a business record at Bullcoming's trial during the testimony of another scientist from the Laboratory, who had neither observed nor reviewed the analyst's work. *Id.* at __, 131 S.Ct. at 2712, 180 L.Ed.2d at 618. The Court of Appeals of New Mexico, as well as the Supreme Court of New Mexico, affirmed Bullcoming's conviction. *Id.* at __, 131 S.Ct. at 2712-13, 180 L.Ed.2d at 618-19.

The Supreme Court reversed Bullcoming's conviction and held that introduction of the Report through the testimony of a technician in the Laboratory who had neither performed nor witnessed the testing did not meet the requirements of the Confrontation Clause. *Id*. at __, __, 131 S.Ct. at 2710, 2713, 180 L.Ed.2d at 616, 619. Justice Ruth Bader Ginsburg, writing for the Court, emphasized that the exhibit resembled those in *Melendez-Diaz*, because it was created to "assist in police investigations" and it was

---

[18] The "Certificate of Analyst" stated, in relevant part:
I certify that I followed the procedures set out on the reverse of this report, and the statements in this block [relating to the integrity of the sample and the analyst's ultimate conclusion] are correct. The concentration of alcohol in the sample is based on the grams of alcohol in one hundred milliliters of blood.

[19] In New Mexico, the threshold for aggravated driving while intoxicated is 0.16 grams per hundred milliliters; the analyst certified that Bullcoming's blood alcohol level was 0.21 grams per hundred milliliters. *Bullcoming v. New Mexico*, 564 U.S. __, __, 131 S.Ct. 2705, 2711, 180 L.Ed.2d 610, 617-18 (2011).

"'formalized' in a signed document . . . headed a 'report'", which brought it within the bounds of the Confrontation Clause:

> In all material respects, the laboratory report in this case resembles those in *Melendez-Diaz*. Here, as in *Melendez-Diaz*, a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations. Like the analysts in *Melendez-Diaz*, [the] analyst [in *Bullcoming*] tested the evidence and prepared a certificate concerning the result of his analysis. Like the *Melendez-Diaz* certificates, [the *Bullcoming*] certificate is "formalized" in a signed document, *Davis*, 547 U.S., at 837, n. 2, 126 S.Ct. 2266 (opinion of THOMAS, J.), headed a "report[.]" . . .
>
> In sum, the formalities attending the "report of blood alcohol analysis" are more than adequate to qualify [the analyst's] assertions as testimonial. The absence of notarization does not remove his certification from Confrontation Clause governance. The New Mexico Supreme Court, guided by *Melendez-Diaz*, correctly recognized that [the analyst's] report "fell within the core class of testimonial statements", described in this Court's leading Confrontation Clause decisions: *Melendez-Diaz*, 557 U.S., at __, 129 S.Ct., at 2531-2532; *Davis*, 547 U.S., at 830, 126 S.Ct. 2266; *Crawford*, 541 U.S., at 51-52, 124 S.Ct. 1354.

*Id.* at __, 131 S.Ct. at 2717, 180 L.Ed.2d at 624 (some internal citations omitted). Justice Ginsburg emphasized that, although the Report in *Bullcoming* was unsworn, as differentiated from those in *Melendez-Diaz*, it would be untenable for the definition of "testimonial statements" to turn on whether the individual making the statement had done so under oath. *Id.* at __, 131 S.Ct. at 2717, 180 L.Ed.2d at 623.

Most recently, in *Williams v. Illinois*, 567 U.S. __, __, 132 S.Ct. 2221, 2229, 183 L.Ed.2d 89, 100 (2012), the Court was faced with a DNA profile produced by a private laboratory, Cellmark, located in Germantown, Maryland. The DNA profile had been solicited by the Illinois State Police from a vaginal swab collected from a rape kit. *Id.* Analysts at Cellmark determined that the DNA profile belonged

to a male;[20] there was no suspect identified at the time. *Id.* The profile was then compared to the DNA database in Illinois by an Illinois State Police forensic specialist and Williams's DNA developed as a result of a prior, unrelated, arrest was a match. *Id.*

The Cellmark DNA profile was later received in evidence during Williams's bench trial during the testimony of the police specialist and not the Cellmark analyst. *Id.* at __, 132 S.Ct. at 2227, 183 L.Ed.2d at 98. The State posited that the Cellmark profile was not admitted for its truth, rather, that it only served to explain the underlying facts the

---

[20] The "RESULTS AND CONCLUSIONS" produced by the Cellmark analyst appeared as follows:

> **RESULTS AND CONCLUSIONS:**
> DNA testing using the Polymerase Chain Reaction (PCR) and the AmpFISTR Profiler Plus[TM] and AmpFISTR COfiler[TM] Amplification Kits was performed on the [vaginal swab and a standard obtained from the victim, L.J.]. The loci tested and the results obtained for each tested sample are listed in Table 1. Additional information regarding possible male contributor(s) is listed in Table 2.
>
> The DNA obtained from the epithelial cell fraction of the vaginal swab is from a female and matches the profile obtained for L.J.
>
> The DNA obtained from the sperm fraction of the vaginal swab is a mixture from a male and a female. Types present in the mixture are consistent with the types obtained from L.J. Assuming that the mixture contains DNA from only two sources and L.J. is one of the sources, the possible types of the male donor are listed in Table 2.
>
> **DISPOSITION:**
> In the absence of specific instruction, evidence will be returned to the submitting agency by Federal Express or another appropriate carrier.
>
> Reviewer: _____/s/_____          Reviewer: _____/s/_____
>        Robin W. Cotton, Ph.D.          Jennifer E. Reynolds, Ph.D.
>        Laboratory Director          Laboratory Director
>        Forensic Laboratory          Forensic Laboratory

specialist had relied upon in reaching her expert opinion.  *Id.* at __, 132 S.Ct. at 2227-28, 183 L.Ed.2d at 98.

The plurality opinion authored by Justice Samuel Alito and joined by Chief Justice John Roberts and Justices Anthony Kennedy and Stephen Breyer,[21] set forth two rationales for concluding that Williams's right of confrontation was not violated by admission of the Cellmark profile.  Justice Alito posited that the profile was not offered for its truth and, therefore, was outside the scope of the Confrontation Clause.  *Id.* at __, 132 S.Ct. at 2228, 183 L.Ed.2d at 99.  Alternatively, Justice Alito stated that the Cellmark profile was not testimonial, because it was not produced for "the primary purpose of accusing a targeted individual", unlike that which had occurred in *Melendez-Diaz* and *Bullcoming*.  *Id.* at __, __, 132 S.Ct. at 2228, 2243, 183 L.Ed.2d at 99, 115.

Justice Clarence Thomas concurred only in the judgment and provided his own opinion.  *Id.* at __, 132 S.Ct. at 2255, 183 L.Ed.2d at 129.  In his view, introducing the Cellmark profile through the testimony of the police specialist did not encumber Williams's cross-examination rights, "because Cellmark's statements lacked the requisite 'formality and solemnity' to be considered 'testimonial' for purposes of the Confrontation Clause."  *Id.*  Justice Thomas opined that "Cellmark's report, in substance,

---

[21] A plurality opinion occurs when five or more Justices agree on the result of a case, but no single opinion garners five votes.  James F. Spriggs II & David R. Stras, *Explaining Plurality Decisions*, 99 Geo. L.J. 515, 515 (2011).  The opinion authored by Justice Alito is, however, criticized by a majority of the Court.  *See Williams v. Illinois*, 567 U.S. __, __, 132 S.Ct. 2221, 2265, 183 L.Ed.2d 89, 139 (Kagan, J., dissenting); *id.* at __, 132 S.Ct. at 2255, 183 L.Ed.2d at 129 (Thomas, J., concurring in judgment but disavowing the reasoning).

certifies nothing." *Id.* at __, 132 S.Ct. at 2260, 183 L.Ed.2d at 134. When considering the question of the purpose of the Cellmark profile, Justice Thomas iterated that, when a statement is created under circumstances that indicate it is to be used in a criminal prosecution or investigation, the statement may be testimonial. *Id.* at __, 132 S.Ct. at 2261, 183 L.Ed.2d at 135. The purpose for creating the statement is not enough, however, under Justice Thomas's rationale, because the statement must also have the requisite "formality and solemnity" to be considered testimonial.[22] *Id.*

In *Derr II*, we were called upon to apply the tenets of *Williams* and did so by "appl[ying] the standard articulated by the Supreme Court in *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260, 266 (1977)", that being, "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by

_____

[22] Justice Elena Kagan authored a dissent, which was joined by Justices Antonin Scalia, Ruth Bader Ginsburg and Sonia Sotomayor. *Id.* at __, 132 S.Ct. at 2264, 183 L.Ed.2d at 138. Justice Kagan lamented the splintered viewpoints among the Justices:

> The Court today disagrees [that Williams's confrontation rights were violated], though it cannot settle on a reason why. Justice ALITO, joined by three other Justices, advances two theories—that the expert's summary of the Cellmark report was not offered for its truth, and that the report is not the kind of statement triggering the Confrontation Clause's protection . . . . [I]n all except its disposition, his opinion is a dissent: Five Justices specifically reject every aspect of its reasoning and every paragraph of its explication. Justice THOMAS, for his part, contends that the Cellmark report is nontestimonial on a different rationale. But no other Justice joins his opinion or subscribes to the test he offers.

*Id.* at __, 132 S.Ct. at 2265, 183 L.Ed.2d at 139 (citations omitted). On the merits of the case, Justice Kagan determined that the report was created to serve as evidence in a criminal trial, putting it squarely within the realm of testimonial statements. *Id.* at __, 132 S.Ct. at 2275, 183 L.Ed.2d at 151.

those Members who concurred in the judgments on the narrowest grounds." *Id.* at 114,

73 A.3d at 269 (internal quotation marks omitted). The narrowest grounds, we opined,

were provided by Justice Thomas's concurrence:

> The plurality opinion expressed that statements are testimonial when they both have "the primary purpose of accusing a targeted individual of engaging in criminal conduct" and are "formalized statements such as affidavits, depositions, prior testimony, or confessions." 567 U.S. at __, 132 S.Ct. at 2242, 183 L.Ed.2d at 116 (plurality). Justice Thomas's concurrence expressed that for statements to be testimonial both "the declarant must primarily intend to establish some fact with the understanding that his statement may be used in a criminal prosecution," 567 U.S. at __, 132 S.Ct. at 2261, 183 L.Ed.2d at 135 (Thomas, J., concurring in judgment) (citation omitted), and the statements must "bear[ ] [an] indicia of solemnity." 567 U.S. at __, 132 S.Ct. at 2259, 183 L.Ed.2d at 133 (Thomas, J., concurring in judgment) (quotation omitted). Those statements, Justice Thomas explained, include "formalized testimonial materials, such as depositions, affidavits, and prior testimony, or statements resulting from formalized dialogue, such as custodial interrogation." 567 U.S. at __, 132 S.Ct. at 2260, 183 L.Ed.2d at 133 (Thomas, J., concurring in judgment) (citations and quotation omitted). The common point of agreement between the plurality opinion and Justice Thomas's concurring opinion is that statements must, at least, be formalized, or have "indicia of solemnity" to be testimonial. Therefore, using the *Marks* approach, we conclude that the narrowest holding of *Williams* is that a statement, at a minimum, must be formalized to be testimonial.

*Id.* at 114-15, 73 A.3d at 270. By embracing Justice Thomas's opinion we emphasized

the formality of a statement or its "indicia of solemnity". *Id.* at 115, 73 A.3d at 270.

In *Derr II* we had been asked to determine whether three exhibits received in

evidence were testimonial. The first exhibit "appear[ed] to be the notes from the bench

work of the serological examiner", which were compiled during the 1985 investigation of

the underlying rape, and were the result of an examination of physical evidence collected

at the scene. *Id.* at 118, 73 A.3d at 272. We opined that the notes, because they lacked

any "signed statements or any other indication that the results or the procedures used to reach those results were affirmed by any analyst", were not sufficiently formalized to be considered testimonial, (*id.* at 119, 73 A.3d at 272); therefore, the admission of the exhibit without the testimony of the analyst who had created it did not violate Derr's right of confrontation.

With respect to the second exhibit, which was a DNA profile created in 2002 from biological material obtained via a vaginal swab of the victim, we observed that it "display[ed] a series of numbers and lines, and on the bottom of the documents [were] the initials of two parties. No statements, however, appear[ed] anywhere on the results attesting to their accuracy or that the analysts who prepared them followed any prescribed procedures." *Id.* at 119, 73 A.3d at 272-73. The initials, we said, certified nothing and, thus, we concluded that the second exhibit was not sufficiently formalized to meet the standard in *Williams*.

The third exhibit was created when "a match was discovered between Derr's existing profile in CODIS[23] and the profile generated in 2002", which led investigators to create a reference DNA sample from Derr's buccal swab. *Id.* at 99, 73 A.3d at 260. The third exhibit was "almost identical in form to the test results from the 2002 DNA test of biological material" obtained from the victim, except that there were no initials on the bottom of the third exhibit. *Id.* at 120, 73 A.3d at 273. The report itself, attached hereto

---

[23] CODIS is short for Combined DNA Index System, which "connects DNA laboratories" at all jurisdictional levels to assist law enforcement agencies in identifying DNA found at crime scenes. *Maryland v. King*, 569 U.S. __, __, 133 S.Ct. 1958, 1968, 186 L.Ed.2d 1, 18-19 (2013).

as Appendix B, reflected no conclusions authored by the analyst and graphically represented only the makeup of the DNA under analysis. The third set of results, we determined, was not sufficiently formalized, and the analyst who had derived the DNA test results was not required to testify. In conclusion, we rejected each of Derr's challenges based on the Confrontation Clause, having determined that the exhibits were not formalized and, thus, were not testimonial.[24]

Since *Derr II* was decided, many other courts also have struggled to interpret *Williams* and apply its tenets. *E.g.*, *State v. Michaels*, 95 A.3d 648, 666 (N.J.), *cert. denied*, __ U.S. __, 135 S.Ct. 761, 190 L.Ed.2d 635 (2014) ("We find *Williams's* force, as precedent, at best unclear."). The essence of the confusion, according to our sister courts, is that none of the opinions in *Williams* articulated what could be described as the "narrowest" ground for the opinion, nor did the plurality and concurring opinions provide overlapping rationales. *See, e.g.*, *State v. Dotson*, 450 S.W.3d 1, 69 (Tenn. 2014), *cert.*

---

[24] In *Cooper v. State*, 434 Md. 209, 73 A.3d 1108 (2013), *cert. denied*, __ U.S. __, 134 S.Ct. 2723, 189 L.Ed.2d 762 (2014), we continued to apply the tenets derived from Justice Thomas's opinion. A semen specimen from a napkin had been sent by the Baltimore City Police Department to The Bode Technology Group from which a DNA profile was developed. A Baltimore City Police Department Crime Lab technician later compared the DNA profile for the specimen found on the napkin with a profile created from a buccal swab of Cooper and found them to be a match. The DNA profile only identified an "unspecified male" as the contributor of DNA found in the sample and did not include any "indication that the results [were] sworn to or certified". *Id.* at 217, 236, 73 A.3d at 1111-13, 1124. We determined that the DNA profile lacked formality and, ergo, was not testimonial. *Id.* at 236, 73 A.3d at 1124.

27

*denied*, __ U.S. __, 135 S.Ct. 1535, 191 L.Ed.2d 565 (2015) ("The *Marks* rule[25] ceases to function as it was intended where *Williams* is concerned because the two opinions that resulted in the judgment share no common denominator rationale."); *Young v. United States*, 63 A.3d 1033, 1043 (D.C. 2013) ("We do not get very far applying *Marks* [to *Williams*], for the two opinions of the Justices who concurred in the judgment in *Williams* lack the necessary common denominator."); *Michaels*, 95 A.3d at 666 ("In short, each of those three opinions in *Williams* embraces a different approach to determining whether the use of forensic evidence violates the Confrontation Clause, and there is no narrow rule that would have the support of a majority of the Supreme Court that we can discern from the opinions in *Williams*."); *State v. Griep*, 863 N.W.2d 567, 579 (Wis. 2015) ("As no opinion overlaps with another, the *Marks* narrowest grounds rule does not apply to *Williams v. Illinois*.").

The District of Columbia Court of Appeals, in *Young v. United States*, opined that "the two opinions of the Justices who concurred in the judgment in *Williams* lack the necessary common denominator" to allow the court to synthesize the narrowest grounds for affirming Williams's conviction. 63 A.3d at 1043. The *Young* court explained that a statement could be accusatory and, therefore, be testimonial under Justice Alito's test, but without being formal enough to satisfy Justice Thomas's test. *Id.* A statement,

---

[25] The "*Marks* Rule" instructs lower courts that, when the Supreme Court issues a plurality opinion, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260, 266 (1977) (internal quotation marks omitted).

conversely, could be formal under Justice Thomas's test, according to the District of Columbia Court of Appeals, but without accusing or targeting a particular suspect and, therefore, not be testimonial under Justice Alito's opinion. *Id.* The *Young* court distilled, nevertheless, a "logically coherent" position that requires, at a minimum, that the statement have an "evidentiary purpose" and "*either* the plurality's targeted accusation requirement *or* Justice Thomas's formality criterion":

> There is an intermediate position. By analogy to *Marks*, it can be argued that while Justice Alito's rationale and Justice Thomas's rationale may not be includible *within each other*, the different tests they utilize to determine whether a statement is testimonial are subsumed within and narrower than *the dissenters'* test. That is so because Justice Alito and Justice Thomas each added an additional requirement to the basic "evidentiary purpose" test espoused by Justice Kagan. If the four-Justice plurality would deem a statement testimonial under the targeted accusation test, the four dissenting Justices surely would deem it testimonial under the broader evidentiary purpose test. Similarly, if Justice Thomas would deem a statement testimonial employing his formality criterion along with the evidentiary purpose test, the four dissenting Justices necessarily would deem it testimonial using the evidentiary purpose test alone. It therefore is logically coherent and faithful to the Justices' expressed views to understand *Williams* as establishing—at a minimum—a sufficient, if not a necessary, criterion: a statement is testimonial at least when it passes the basic evidentiary purpose test plus *either* the plurality's targeted accusation requirement *or* Justice Thomas's formality criterion. Otherwise put, if *Williams* does have precedential value as the government contends, an out-of-court statement is testimonial under that precedent if its primary purpose is evidentiary and it is either a targeted accusation or sufficiently formal in character.

63 A.3d at 1043-44.

Other of our sister state supreme courts have declined to apply *Williams* and have retreated, instead, to *Melendez-Diaz* and *Bullcoming*. The Supreme Court of Pennsylvania, in *Commonwealth v. Yohe,* 79 A.3d 520, 537 (2013), *cert. denied*, __ U.S.

__, 134 S.Ct. 2662, 189 L.Ed.2d 209 (2014), observed that the plurality and concurring opinions in *Williams* "regarded the Cellmark report as non-testimonial, and not analogous to the reports admitted in *Melendez-Diaz* and *Bullcoming*." The Pennsylvania court, similarly, distinguished the report at issue in *Yohe* from that in *Williams* and, therefore, determined that *Williams* was "of little assistance in deciding the matter". *Id.*

The Supreme Court of New Jersey, in *State v. Michaels*, 95 A.3d at 666, asserted that, "there is no narrow rule that would have the support of a majority of the Supreme Court that we can discern from the opinions in *Williams*" and that, "*Williams* advances a wholly new approach to when a forensic document will be deemed testimonial," which "diverges from the primary purpose test that had been applied previously." The *Michaels* court continued that, because *Williams* did not explicate that it was abandoning the primary purpose test from *Crawford*, it, too, would not alter the approach promulgated by *Crawford* to the extent that it was refined by *Melendez-Diaz* and *Bullcoming*. *Id.* at 666-68.

The United States Court of Appeals for the Fifth Circuit in *United States v. Duron-Caldera*, 737 F.3d 988, 994 (2013), refused to follow the *Williams*'s plurality opinion and, similarly, criticized the case for abandoning *Crawford* and its progeny. The Fifth Circuit opined that, "five Justices expressly rejected [the plurality's] test" and that, therefore, it "would not be controlling under *Marks*". *Id.* Continuing, the court concluded that the plurality's test, which required that a statement "accuse" a specific individual to be testimonial, was unsupported by Confrontation Clause precedent, because the concern of the clause is the creation of "statements one 'would reasonably

30

expect to be used *prosecutorially* . . . [or] at *a* later trial.'" *Id.* at 995, quoting *Crawford*, 541 U.S. at 51-52, 124 S.Ct. at 1354, 158 L.Ed.2d at 193 (emphasis and alterations added by *Duron-Caldera* court). The Fifth Circuit, finally, criticized the *Williams*'s plurality for relying "on an overly-narrow view of the rationale behind confrontation", because it assumed "that the Confrontation Clause is designed to protect only against a defendant-related motive to behave dishonestly." *Id.* at 995-96 (internal quotation marks omitted). The *Duron-Caldera* court, instead, continued to apply Confrontation Clause jurisprudence as defined through *Bullcoming* and *Melendez-Diaz*.[26] *Id.* at 993.

It is noteworthy that no other state supreme court nor federal circuit court of appeals has solely relied upon Justice Thomas's concurrence. In light of what has transpired since *Williams* and *Derr II*, which we have fleetingly summarized, we take this opportunity to better refine our own analysis. When this Court is addressing a federal constitutional question we recognize that we "are responsible for executing" the "policy directives" issued by the Supreme Court. Lawrence Baum, *Implementation of Judicial Decisions: An Organizational Analysis*, 4 Am. Pol. Q. 86, 89 (1976). We cannot alter the message conveyed by the Supreme Court, unlike our own common law, but we, like our

---

[26] Other courts, such as those cited by the State, have avoided *Williams* by relying on their own jurisprudence. *E.g.*, *Commonwealth v. Greineder*, 984 N.E.2d 804, 815 n.15 (Mass. 2013) (noting that the Massachusetts rules of evidence are fundamentally different from those of Illinois, which were involved in *Williams* and, therefore, *Williams* did not alter Massachusetts's jurisprudence); *Jenkins v. State*, 102 So.3d 1063, 1067 n.2 (Miss. 2012) (noting that *Williams* had no bearing on the case and relying on the Court's own precedent).

sister state supreme courts, strive to "carry out" Supreme Court precedent "accurately and faithfully." *Id.*

By examining the way in which sister courts have applied *Williams* we have the opportunity to explore how best to accurately and faithfully implement the Supreme Court's pronouncement on the issue of the Confrontation Clause in the context of forensic documents, when "other [courts] have persuasively argued" a different application. *Critical Mass Energy Project v. Nuclear Regulatory Commission*, 975 F.2d 871, 876 (D.C. Cir. 1992). We, therefore, examine *Williams*'s tenets, as applied by our sister courts, to ensure that *Derr II*, "which seems superficially relevant to resolving [the] dispute, is not applied to the facts of a case that would not be well resolved under the prior decision." Robert S. Summers, *Precedent in the United States (New York State)*, *in* Interpreting Precedents 391 (D. Neil MacCormick & Robert S. Summers eds., 1997). Doing so does not overrule our decision in *Derr II*, but serves to expand our application of *Williams* in an attempt to adhere as accurately and faithfully as we can to the Supreme Court precedent. In so doing, we are respectful of the adoption of Justice Thomas's concurrence in *Derr II*, but recognize that we need to refine the analysis required in the determination of what is testimonial in the forensic document framework.

As the District of Columbia in *Young v. United States* recognized, an approach to *Williams* can be constructed by formulating a test that, if satisfied, would result in adherence to the opinions of a majority of the Justices. The *Young* court opined that, if a forensic document is testimonial under either Justice Thomas's or Justice Alito's rationale, then it, necessarily, is testimonial under the rule advocated by Justice Kagan's

32

dissent, because each of the plurality's opinions narrows the broader rule urged by the dissent. 63 A.3d at 1043-44. This is so, according to the District of Columbia Court of Appeals, because Justice Thomas provides a strict rule requiring that, to be testimonial, a forensic document must have been created with the purpose of serving as evidence in a criminal trial and that it must be sufficiently "formal". *Id.* at 1043, quoting *Williams*, 567 U.S. at __, 132 S.Ct. at 2255, 183 L.Ed.2d at 129. Justice Alito posits a test that is, instead, more limited with respect to the document's purpose: that a forensic document is testimonial if it has "the primary purpose of accusing a targeted individual."[27] *Id.* at 1040, quoting *Williams*, 567 U.S. at __, 132 S.Ct. at 2243, 183 L.Ed.2d at 115. The *Young* court's test is satisfied, then, when either Justice Thomas's or Justice Alito's opinion is fulfilled. *Id.* at 1044.

By embracing both Justice Thomas's and Alito's opinions, we guide our trial courts, when reviewing the admissibility of forensic documents under the Confrontation Clause, to consider first, whether the report in issue is formal, as analyzed by Justice Thomas, (*Williams*, 567 U.S. at __, 132 S.Ct. at 2255, 183 L.Ed.2d at 129); or, if not, whether it is accusatory, in that it targets an individual as having engaged in criminal conduct, under Justice Alito's rationale, (*id* at __, 132 S.Ct. at 2243, 183 L.Ed.2d at 115). This expanded approach to *Williams* requires that we, like our brethren on the trial courts,

---

[27] Justice Kagan's dissent in *Williams*, 567 U.S. at __, 132 S.Ct. at 2264-77, 183 L.Ed.2d at 138-52, is broader than Justices Thomas's and Alito's opinions, according to the *Young* court, because it urges a test that drops Justice Thomas's "formality" requirement and with a more general purpose than that proposed by Justice Alito, that a forensic document is testimonial if it was created with the primary purpose of serving as evidence in a criminal trial. *Young v. United States*, 63 A.3d 1033, 1043 (D.C. 2013).

first determine if the forensic report at issue reflects the "'solemnity of an affidavit or deposition'", (*Derr II*, 434 Md. at 113, 73 A.3d at 268, quoting *Williams*, 567 U.S. at __, 132 S.Ct. at 2260, 183 L.Ed.2d at 133 (Thomas, J., concurring)), which would satisfy Justice Thomas's inquiry. Such formality does not require that the document contain specific words of attestation, but that the report, in substance, functions as a certification. *Cf. Williams*, 567 U.S. at __, 132 S.Ct. at 2260, 183 L.Ed.2d 134 (asserting that "Cellmark's report, *in substance*, certifies nothing") (Thomas, J., concurring) (emphasis added).

Should there be a determination that the document in issue was not formal, the next inquest would be whether the report has "the primary purpose of accusing a targeted individual of engaging in criminal conduct". *Id.* at __, 132 S.Ct. at 2242, 183 L.Ed.2d at 114. (Alito, J.). If the report was generated before the defendant was a named suspect in the investigation, then the report could not be accusatory. *Id.* at __, 132 S.Ct. at 2228, 183 L.Ed.2d at 99. Similarly, when a report is created as a "reference" to "verify" the accuracy of a previous document, (*e.g.*, *Derr II*, 434 Md. at 99, 73 A.3d at 260), it is not accusatory. The forensic document, to be testimonial pursuant to the *Williams* plurality, must contain a conclusion that connects the defendant to the underlying crime.

Under the paradigm so articulated, the Forensic DNA Case Report at issue in the instant case is testimonial. With respect to Justice Thomas's formality inquiry, the Report contains a certification in the phrase "within a reasonable degree of scientific certainty". The inclusion of such language, "within a reasonable degree of scientific certainty", in a DNA report identifying a match between a defendant's profile with that of

a perpetrator is key to the acceptance of the expert's testimony into evidence in Maryland. *Young v. State*, 388 Md. 99, 120, 879 A.2d 44, 56 (2005). Without this language certifying the result, the testimony is without foundation. *Id.* The phrase, then, of "within a reasonable degree of scientific certainty", constitutes such "talismanic words" that, without them, the testimony cannot cross the threshold of acceptance by the judge as gatekeeper.[28] *See Mayor & City Council of Baltimore v. Theiss*, 354 Md. 234, 261, 729 A.2d 965, 980 (1999) (Rodowsky, J., concurring).

The Report in issue, thus, is testimonial pursuant to Justice Thomas's concurring opinion in *Williams*, because it was certified and was signed by the analyst who had performed the test, indicating that the analyst's results had been validated according to federal standards, even if unsworn.[29] It may not be within the "core class" of sworn documents, such as affidavits, to which Justice Scalia referred in *Crawford*, 541 U.S. at 51-52, 124 S.Ct. at 1364, 158 L.Ed.2d at 193, but it does come within "formalized

---

[28] In *Derr II*, we had occasion to consider whether a specific jury instruction was generated by the use of the phrase "to a reasonable degree of scientific certainty". 434 Md. 88, 132, 73 A.3d 254, 280 (2013). Although we did not have occasion to opine about its meaning, its use in *Derr II*, another DNA case in which expert testimony was received, is illustrative of its usage to certify profile matches between a defendant and the crime.

[29] A contrary conclusion requiring such magic words as "certification" would elevate form over substance, which this Court is loath to do, especially when constitutional rights are in issue. *E.g.*, *In re Spalding*, 273 Md. 690, 703, 332 A.2d 246, 253 (1975) ("it is clear that labels are not controlling in determining the applicability of the Due Process Clause to juvenile proceedings"); *see also Williams*, 567 U.S. at __, 132 S.Ct. at 2260, 183 L.Ed.2d at 134 ("Cellmark's report, *in substance*, certifies nothing") (Thomas, J., concurring) (emphasis added).

testimonial materials" to which Justice Thomas made reference and gave non-exclusive examples, (*Williams*, 567 U.S. at __, 132 S.Ct. at 2260, 183 L.Ed.2d at 133).

The Report before us is testimonial under Justice Alito's plurality opinion as well, because it was created with "the primary purpose of accusing a targeted individual of engaging in criminal conduct". *Williams*, 567 U.S. at __, 132 S.Ct. at 2242, 183 L.Ed.2d at 114. The language "within a reasonable degree of scientific certainty, Harold Norton . . . is the major source of the biological material obtained from [the] evidence" clearly "accus[es] a targeted individual of engaging in criminal conduct". *See id.*

The result we reached in *Derr II*, whereby the three exhibits were not testimonial, does not change, however, under our enunciated inquiry. Although *Derr II* was decided by the application of Justice Thomas's rationale, even under Justice Alito's plurality, the three forensic reports would not have been considered testimonial, because they were not created to accuse "a targeted individual of engaging in criminal conduct". *Williams*, 567 U.S. at __, 132 S.Ct. at 2242, 183 L.Ed.2d at 114. In *Derr II* we noted that the first report reflected "the notes from the bench work of the serological examiner", contained no statement regarding the accuracy of the procedures the analyst had used to reach the results and was created before a suspect had been identified in the investigation. *Derr II*, 434 Md. at 118-19, 73 A.3d at 272. Nothing about the first report accused an individual of engaging in criminal conduct and, therefore, it would not have been considered testimonial by the *Williams* plurality. *See Williams*, 567 U.S. at __, 132 S.Ct. at 2228, 183 L.Ed.2d at 99 ("The report was sought not for the purpose of obtaining evidence to

be used against [Williams], who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose.").

The second report at issue in *Derr II*, similarly, was developed when the Charles County "Sheriff's Office submitted the rape kit to the FBI laboratory for additional forensic analysis." 434 Md. at 98, 73 A.3d at 260. As such, it was composed before Derr was a suspect in the investigation and it was created "for the purpose of finding a rapist who was on the loose." *Williams*, 567 U.S. at __, 132 S.Ct. at 2228, 183 L.Ed.2d at 99.

The third of the *Derr II* reports was developed after it was discovered that Derr's existing profile in CODIS matched the previous report developed during the investigation. The final document, generated in order to "create a new 'reference DNA sample' and to verify that Derr's profile in CODIS was accurate", appeared only as a graphic representation of test results, which did not contain even the name of the individual from whom the DNA was sampled, much less any accusatory statements. *Derr II*, 434 Md. at 99, 73 A.3d at 260; Appendix B. The third report, which the majority in *Derr II* determined was non-testimonial, would also have been so rendered under Justice Alito's plurality opinion, because nothing in the report "accus[es] a targeted individual of engaging in criminal conduct". *Williams*, 567 U.S. at __, 132 S.Ct. at 2242, 183 L.Ed.2d at 114.

Even assuming *arguendo* that we were not able to discern a viable framework from *Williams* to apply in the present case, we would note, alternatively, that the instant report is testimonial under Supreme Court precedent prior to *Williams* as akin to the report presented in *Bullcoming*, which five Justices, including Justice Thomas,

37

determined to be testimonial.[30]  *See State v. Stanfield*, 347 P.3d 175, 184 (Idaho 2015) ("Because no position [in *Williams*] received support from a majority of the justices, *Williams* does not provide us a governing legal principle and this Court views the decision as limited to the unique set of facts presented in that case.").

In *Bullcoming*, Bullcoming's blood sample was sent to the Scientific Laboratory Division of the New Mexico State Police to be analyzed for Bullcoming's blood alcohol concentration.  564 U.S. at __, 131 S.Ct. at 2710, 180 L.Ed.2d at 616.  The Report indicated that the sample was submitted by the arresting officer to be checked for blood alcohol concentration, implicitly for a suspected driving under the influence charge.  *Id.* The Report then contained a section titled "Certificate of Analyst", which embodied the result of the analyst's test—that Bullcoming's blood alcohol concentration was above the legal limit—and an assertion that the proper procedures were followed.[31]

The present Report reflects a DNA profile, produced by an analyst at Bode Technology, from a piece of fabric taken from the mask identified as the one worn by the

---

[30]  Reliance upon *Bullcoming* is appropriate, because the Forensic DNA Case Report is distinguishable from the Cellmark Report in *Williams*, attached hereto as Appendix C. *See Commonwealth v. Yohe*, 79 A.3d 520, 537 (Pa. 2013), *cert. denied*, __ U.S. __, 134 S.Ct. 2662, 189 L.Ed.2d 209 (2014) ("As explained below, we view the Toxicology Report at issue in this case as similar to the scientific reports in *Melendez–Diaz* [] and *Bullcoming*, and, guided by these opinions, hold that it is likewise testimonial.  We therefore find *Williams* distinguishable, and of little assistance in deciding the matter before us.").  The instant Report, unlike the Cellmark Report, contains a certification, identifies a specific individual as the culprit and reflects the statistical likelihood that the identified person is the guilty party in the underlying case.

[31] The first page of the Report at issue in *Bullcoming* is attached at the end of this opinion as Appendix A.

assailant.  That Report materially is identical to the one in *Bullcoming*.  The Report was made to establish "some fact in a criminal proceeding"—here, the identity of the assailant, (*id.* at __, 131 S.Ct. at 2716, 180 L.Ed.2d at 623 (internal quotation marks omitted)), and details the results of forensic testing on evidence gathered by the police.  Viewed side-by-side with the *Bullcoming* Report, the Bode Technology analysis also describes the relevant samples, test methodology, and results; includes the signatures of laboratory officials; and contains a certification that proper procedures were followed in reaching the ultimate conclusion identifying the suspect, named to the analyst as "suspect Harold Norton", as the perpetrator of a criminal offense.  Under the Supreme Court's prior analysis, therefore, the substance of the Report could come into evidence only if Norton had a chance to cross-examine the responsible analyst.[32]

---

[32] We have concluded that admission of the Report without the analyst's testimony violated Norton's Sixth Amendment right of confrontation, so that the question of whether the supervisor was the proper conduit for testimony about the Report is answered negatively.  *See Bullcoming*, 564 U.S. at __, 131 S.Ct. at 2716, 180 L.Ed.2d at 623 ("[W]hen the State elected to introduce [the analyst's] certification, [the analyst] became a witness Bullcoming had the right to confront.  Our precedent cannot sensibly be read any other way.  See *Melendez-Diaz*, 557 U.S., at __, 129 S.Ct., at 2545 (KENNEDY, J., dissenting) (Court's holding means 'the . . . analyst who must testify is the person who signed the certificate').").

The cases cited by the State to the contrary are inapposite, because those courts either first determined that the forensic document at issue was not testimonial, (*see People v. Barba*, 155 Cal.Rptr.3d 707, 730 (Cal. Ct. App.), *cert. denied*, __ U.S. __, 134 S.Ct. 628, 187 L.Ed.2d 407 (2013) ("The primary purpose of the DNA reports was not testimonial".)), or the testifying expert was a witness with respect to his or her own analysis, review and certification, (*see Marshall v. People*, 309 P.3d 943, 947 (Colo. 2013) ("[The testifying expert] synthesized the tests performed by two different analysts . . . [t]hen she reviewed the data generated by the scientific instruments to ensure that the controls show[ed] the instruments were working properly. . . . Finally, she reviewed the analysts' notes to conclude that they followed lab protocol throughout the testing process.

(continued . . . )

In the event that a trial court has occasion to review a forensic document that is analogous to the report discussed in *Bullcoming*, application of *Bullcoming* is appropriate to determine the impact of the accused's right of confrontation on the item's admissibility. A report may be considered so analogous when it includes the signatures of laboratory officials, identifies the accused as the culprit in the underlying investigation, conveys conclusory statements and certifies that proper procedures were followed in reaching the ultimate conclusion.

The reports at issue in *Derr II*, for example, were not analogous to that in *Bullcoming*, because the *Derr II* reports did not include, substantially, a certification nor did they contain any language referring to a specific individual as being connected with the underlying offense. *Compare* Appendix A (report from *Bullcoming*), *with* Appendix B (third report from *Derr II*, which, we said, was identical to the second report in that case).

In conclusion, the Forensic DNA Case Report in the instant case is testimonial within *Williams v. Illinois*, 567 U.S. __, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012).

---

( . . . continued)
Only after she performed all of these steps did she certify the test results and sign the form that was sent back to [investigators]. In other words . . . she testified as to her own involvement in the process".) (internal footnote omitted); *State v. Lopez*, 45 A.3d 1, 13 (R.I. 2012) (The testifying expert therein "was integrally involved in the entire process of DNA testing, analysis, and certification, and he formulated the allele table and provided expert testimony at trial concerning the conclusions he drew therefrom.")).
    *State v. Manion*, 295 P.3d 270, 277 (Wash. Ct. App. 2013), also cited by the State in support of its averment that the supervisor's testimony was admissible despite the testimonial nature of the Forensic DNA Case Report, is factually distinguishable from the instant case, as well as *Bullcoming* and *Williams*, because, in *Manion*, "[the analyst's] draft report was testimonial but never admitted into evidence."

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

Judge Harrell joins the judgment only.

# APPENDIX A

**SCIENTIFIC LABORATORY DIVISION**
700 Camino de Salud, NE, P.O. Box 4700, Albuque... que, NM 87196-4700
Please type or print full information to avoid delay in report.

**REPORT OF BLOOD ALCOHOL ANALYSIS**

| 8-16-05 | 0830 | 800 501450 |
|---|---|---|
| Date Received | Time Received | Lab. No. |

## PART A-INFORMATION IN THIS BLOCK TO BE FILLED IN BY ARRESTING OFFICER

**SEND LAB ANALYSIS REPORT TO:**

Name: Farmington Police Dept
(Complete name of your agency)

Address: 900 municipal
(Street or post office box number)

Farmington     NM     87401
(City)          (State)   (Zip Code)

**ARRESTING OFFICER IDENTIFICATION:**

Name: David Rock     Date 8-14-05

Department: FPD     Arrest Time: 1700 ☐AM ☒PM

Blood drawn by: LACOMBS RN     Date blood drawn: 8-14-05

Place drawn: SJRMC     Time blood sample drawn: 1825 ☐AM ☒PM

Blood draw witnessed by: _____ (Signature)

REMARKS: check for blood Alcohol concentration

_____ (Signature of arresting officer)

**SEND COPY TO:**

Donor's identification:

Name: Bullcoming     Donald     L
(Last)          (First)    (Middle)

Address: 2011 Troy King #5 207
(Street or post office box number)

Farmington     NM     87401
(City)          (State)   (Zip Code)

Sex M   Weight 210   Date of Birth: 5-11

SSN: 44/60 5813   Place of arrest: 30th / Farmington

Dr. Lic# 080582705   County: OK

**REASON SUSPECT STOPPED:**

☐ Erratic Driving

☒ Accident ☐ Fatal ☐ Great Bodily Injury ☐ Other:

☐ Other:

Investigated or Witnessed by: Rock R643
(Signature)

## INFORMATION BELOW IS TO BE FILLED IN BY DRAWER OF ANY BLOOD SAMPLE

I certify that on the date, time and place indicated above, I drew blood samples from the above named donor and that I marked and sealed the samples with the donor's name. The blood was collected using the entire contents of an SLD-approved blood collection kit in accordance with the instructions.

LA COATES, RN     Date 8-14-05   Time RN   Employer Name SJRMC ER
(Signature of blood drawer)

## PART B- LABORATORY USE ONLY

### CERTIFICATE OF RECEIVING EMPLOYER

Specimen Blood ☒   ☐ Other _____

Received from: Via Mail ☒   In Person ☐   Other ☐

Seal Intact: Yes ☒   No ☐   If No, explain _____

I certify that on the date shown in the "date received" blank above, I received the sample which accompanied this report and followed the procedures set out on the reverse of this report, and the statements in this block are correct.

Received from: _____

Other Remarks: _____

Yvonne Hautzinger
(Signature of receiving employee)

### CERTIFICATE OF ANALYST

The seal of this sample was received intact and broken in the laboratory: Yes ☒   No ☐   If No, explain _____

Result of Analysis

Blood sample: 0.21 gms/100ml alcohol concentration in sample

I certify that I followed the procedures set out on the reverse of this report, and the statements in this block are correct. The concentration of alcohol in the sample is based on the grams of alcohol in one hundred milliliters of blood.

Date of analysis: 8/17/05

Remarks: _____

**STATE'S EXHIBIT**
8 / 1
State v. Bullcoming
CR-2005-1157-6

Analyzed by: _____ (Signature of analyst)

### CERTIFICATE OF REVIEWER

I certify that the analyst who conducted the analysis in this case meets the qualifications required by the director of this laboratory to properly conduct such analyses; the supervisor of analysts is also qualified to conduct such analyses, and that the established procedure has been followed in the handling and analysis of the sample in this case.

Date 8/18/05   Reviewer: _____

### CERTIFICATE OF MAILING

I certify that on this date I mailed a legible copy of this report to the donor, in accordance with the mailing procedure set out on the reverse of this report.

Date: 8-22-05   Laboratory Employee: Yvonne Hautzinger

SLD 705 (Rules of Procedure for the Mo... ███████     ██████ Rule 6-607; and Rules of Criminal Procedure for Form # SLD 705 as amended, effective July 1, 1992 (rev 11/04)

— Appendix D 31A —

# APPENDIX B



For research use only
-1-
Not for use in diagnostic systems

2



For research use only                              -1-                    Not for use in diagnostic systems

FYI

KID Profiler.

show 4 locations

3

# APPENDIX C

## CELLMARK
DIAGNOSTICS

8027¹ Goldenrod Lane · Germantown, Maryland 20876

**Report of Laboratory Examination**
February 15, 2001

Telephone: (301) 428-4980  (400) USA-LABS
Administration Fax: (301) 428-4877
Laboratory Fax: (301) 483-7645

Mr. Rodney Anderson
Forensic Science Center at Chicago
1941 West Roosevelt Road
Chicago, IL 60608

L. S

CASE NO:        ILBL00-0029          SUBJECT:

AGENCY CASE NO: C00-007770

STORAGE NO:

### EXHIBITS RECEIVED:

| ITEM | DATE RECEIVED | QTY. | DESCRIPTION | TESTED (#) | |
|------|---------------|------|-------------|------------|---|
| C00-007770:1B1 | 11/29/00 | 1 | Vaginal Swab | ☑ | 1 |
| C00-007770:1A1 | 11/29/00 | 1 | Victim Standard | ☑ | 1 |

### RESULTS AND CONCLUSIONS:

DNA testing using the Polymerase Chain Reaction (PCR) and the AmpFlSTR Profiler Plus™ and AmpFlSTR COfiler™ Amplification Kits was performed on the indicated exhibits. The loci tested and the results obtained for each tested sample are listed in Table 1. Additional information regarding possible male contributor(s) is listed in Table 2.

The DNA obtained from the epithelial cell fraction of the vaginal swab is from a female and matches the profile obtained for
L. S

The DNA obtained from the sperm fraction of the vaginal swab is a mixture from a male and a female. Types present in the mixture are consistent with the types obtained from  L. S  ,  Assuming that the mixture contains DNA from only two sources and      is one of the sources, the possible types of the male donor are listed in Table 2.   L. S

### DISPOSITION:

In the absence of specific instruction, evidence will be returned to the submitting agency by Federal Express or another appropriate carrier.

Reviewer: _Robin Cotton_
Robin W. Cotton, Ph.D.
Laboratory Director
Forensic Laboratory

Reviewer: _Jennifer Reynolds_
Jennifer E. Reynolds, Ph.D.
Laboratory Director
Identity Laboratory

Cellmark Diagnostics, inc. is a subsidiary of Lifecodes Corporation

2   C00-77770 SL

## Report of Laboratory Examination

2/15/2001

Case Number:       ILBL00-0029

Agency Case No:    C00-007770

Table 1: (Sample Profiles)

| Sample Name | D3S1358 | vWA | FGA | D8S1179 | D21S11 | D18S51 | D5S818 | D13S317 | D7S820 | D16S539 | TH01 | TPOX | CSF1PO | AMEL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vaginal Swab -E1 ILBL00-0029V3-01E1 C00-007770-1E1 | 16,13 | 18,18 | 22,06 | 14,16 | 29,30 | 18 | 8,12 | 11,12 | 11 | 11,11 | 7,8 | 8,11 | 10 | X |
| Vaginal Swab -E2 ILBL00-0029V3-01E2 C00-007770-1E2 | 16,17,18E2 19 | 16,18 | 18,22,22,06 | 14,16 | 29,30,(30) | 13,17,18 | 10,11,13 | 11,12 | 10,11,12 | 9,10,11,12 | 7,8 | 8,11 | 8,10 | X,X |
| 1 – 5 ILBL00-0029VC-01 C00-007770-1A1 | 16,17 | 17,18 | 18,24 | 14,16 | 29,30 | 14,16 | 10,12 | 10,12 | 11,11 | 10,12 | 7,8 | 8,11 | 10,10 | X,X |

Table 2: (Deduced Male Donor Profile)

| | D3S1358 | vWA | FGA | D8S1179 | D21S11 | D18S51 | D5S818 | D13S317 | D7S820 | D16S539 | TH01 | TPOX | CSF1PO | AMEL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vaginal Swab -D ILBL00-0029VS-01D   COUS C00-007770-1B1 | 16,19 | 17 | 18,23 | 10 | 28,32 | 13,17 | 10,12,13 | 12 | 10,12 | 9,11 | 9 | 8,10 | 8,10 | X,Y |

E1 = Epithelial Cell Fraction
E2 = Sperm Fraction
D = Deduced

[] = Minor Alleles most likely from a third source, and included in deduced male donor profile.
() = The results are peculiar but may be present.

It may not be possible to determine whether DNA from a female is present when DNA from a male is detected.
The results listed in the table do not depict intensity differences.
Weak or ambiguous results may have been observed that were due to the presence of DNA from more than one individual or to technical artifacts; these additional results were not interpreted.
COUS = This sample is reported in a CODIS CMF file.

ABI PRISM

Plot e020901CK (MS) PP    1:57:34 PM Mon, Feb 12, 2001
Licensed to Cellmark, Diagnostic    Genotyper® 2.5

80  100  120  140  160  180  200  220  240  260  280  300  320  340  360  380  400

ILBL000029VS01E2 P 14 Blue    (123)L000761 C00-00772/31B1 ILBL000029VS01E2 P

4000
3000
2000
1000

15  19
123.68
222
16
127.54
3901
17
131.53
2205
18
135.91
212
140.07
1248

19
179.16
217
17
179.14
4897
18
183.10
1585

18  20
218.20  24
1.67  26
1001
22  17
252.87
2065
244
248.61

For research use only    -1-    Not for use in diagnostic systems

ABI
PRISM

Plate: 720901CK (FGA/FL) P
Licensed to Cellmark, Diagnostic

1:16:10 PM Mon, Feb 12, 200
Genotyper® 2.

| 100 | 150 | 200 | 250 | 300 | 350 | 400 |

ILBL000029VS01E2 P 14 Blue    (12)L000751 C00-0072N181-ILBL000029VS01E2 P

4000
3000
2000
1000

| 16 | | 17 | | 18 | 26 |
| 127.64 | | 179.14 | | 213 | 1001 |
| 8901 | | 4557 | | | 345.61 |
| 17 | | 18 | | | |
| 131.53 | | 183.10 | | 267.37 | |
| 2205 | | 1955 | | 12000 | |
| 19 | | | | | |
| 140.07 | | | | | |
| 1248 | | | | | |

ILBL000029VS01E2 P 14 Green    (12)L000751 C00-0072N181-ILBL000029VS01E2 P

5000
4000
2000

| X | | 14 | | 29 | | 28 | 17 |
| 103.58 | | 149.28 | | 204.88 | | 265.37 | |
| 7041 | | 6620 | | 4075 | | 1174 | 18 |
| Y | | 15 | | 30 | | | 303.63 |
| 109.14 | | 158.02 | | 208.86 | | | 141 |
| 1895 | | 2276 | | 3450 | | | 308.27 |
| | | | | | | | 2130 |

For research use only                              -1-          Not for use in diagnostic systems

7



For research use only                          -1-              Not for use in diagnostic systems

8



for research use only     -2-     Not for use in diagnostic systems



For research use only -3- Not for use in diagnostic systems



or research use only - 1 - Not for use in diagnostic systems



For research use only    -2-    Not for use in diagnostic systems

13





for research use only        -2-        Not for use in diagnostic systems

08/02/2011 14:47 FAX 773 869 4135          TRAFFIC                                    ☒030



or research use only                              Not for use in diagnostic systems