*Ronnie Lee Rainey, Sr. v. State of Maryland*, No. 1938, September Term, 2017, filed May 4, 2020.  Opinion by Thieme, J.

**CRIMINAL PROCEDURE — SIXTH AMENDMENT — CONFRONTATION CLAUSE — "TESTIMONIAL HEARSAY" — *Crawford v. Washington*, 541 U.S. 36 (2004):**  In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the Confrontation Clause generally bars the introduction into evidence, at a criminal trial, of "testimonial hearsay," unless the defendant had a prior opportunity to cross-examine the declarant, and the declarant was presently unavailable to testify.

**CRIMINAL PROCEDURE — SIXTH AMENDMENT — CONFRONTATION CLAUSE — "PRIMARY PURPOSE" TEST:**  Statements are testimonial when the circumstances objectively indicate that there is no ongoing emergency, and that the "primary purpose" of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.  Statements made in the absence of any interrogation, moreover, are not necessarily nontestimonial.

**CRIMINAL PROCEDURE — SIXTH AMENDMENT — CONFRONTATION CLAUSE — "PRIMARY PURPOSE" TEST AS APPLIED TO SCIENTIFIC AND FORENSIC REPORTS — *Williams v. Illinois*, 567 U.S. 50 (2012):**  The Supreme Court is sharply divided as to how *Crawford* should apply to the admissibility, at a criminal trial, of scientific and forensic reports, and of expert testimony derived, in whole or in part, from statements contained in such reports.  The fractured 4-1-4 decision in *Williams v. Illinois*, 567 U.S. 50 (2012), resulted in three different tests for determining whether a scientific or forensic report is "testimonial."

**CRIMINAL PROCEDURE — SIXTH AMENDMENT — CONFRONTATION CLAUSE — "PRIMARY PURPOSE" TEST AS APPLIED TO SCIENTIFIC AND FORENSIC REPORTS — *State v. Norton*, 443 Md. 517 (2015):**  The Court of Appeals has interpreted *Williams* as mandating a two-stage inquiry in determining whether scientific and forensic reports are "testimonial":  first, whether the statements at issue in such a report satisfy the basic evidentiary purpose test espoused by Justice Kagan in her dissenting opinion; and second, if so, whether those statements satisfy *either* the formality test advanced by Justice Thomas, in his concurring opinion, *or* the targeted accusation test proposed by Justice Alito, in his plurality opinion.  Only if the statements at issue satisfy both prongs are they deemed "testimonial."

**CRIMINAL PROCEDURE — SIXTH AMENDMENT — CONFRONTATION CLAUSE — RELATIONSHIP BETWEEN MARYLAND RULE 5-703 AND THE CONFRONTATION CLAUSE:**  Although the language of Rule 5-703 would suggest that a trial court may permit an expert witness to testify about testimonial statements of a non-testifying witness and, subject to a limiting instruction, disclose those statements to a

jury, the Confrontation Clause takes precedence where the rule and the Constitution are in seeming conflict. Thus, the general rule governing the admissibility of expert testimony does not apply if the otherwise inadmissible evidence amounts to "testimonial hearsay," nor is such evidence admissible only for the purpose of evaluating the validity and probative value of the expert's opinion or inference, that is, for a purportedly non-hearsay purpose.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1938

September Term, 2017

ON MOTION FOR RECONSIDERATION

———————————————————————

RONNIE LEE RAINEY, SR.

v.

STATE OF MARYLAND

———————————————————————

Nazarian,
Arthur,
Thieme, Raymond G., Jr.
    (Senior Judge, Specially Assigned),

JJ.

———————————————————————

Opinion by Thieme, J.

———————————————————————

Filed:  May 4, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

In a bifurcated proceeding, Ronnie Lee Rainey, Sr., appellant, pleaded guilty, in the Circuit Court for Prince George's County, to facts constituting the actus reus of first-degree murder and related offenses,[1] but elected a jury trial on the issue of criminal responsibility. Thereafter, a jury found that, at the time of the offenses, Rainey was criminally responsible for them. After the court imposed a sentence of life imprisonment plus additional terms for the related offenses,[2] Rainey noted this appeal, raising the following question:

> Were Rainey's constitutional rights violated when the circuit court permitted the State to introduce into evidence testimonial statements in the form of psychological test results of a non-testifying expert, through the testimony of another expert who did not perform the relevant psychological testing, and where Rainey had no opportunity to confront the non-testifying expert?

---

[1] Rainey pleaded guilty to having committed the actus reus of every crime charged in a 14-count indictment. That indictment charged him with first- and second-degree murder of his wife, Lisa Rainey, as well as his stepdaughter, Arialle Shelton; attempted first- and second-degree murder, and first- and second-degree assault, of his son, Ronnie Lee Rainey, Jr.; first- and second-degree assault of Ms. Shelton's friend, Kevin James; and four counts of use of a handgun in the commission of a crime of violence, one for each victim.

[2] The court imposed three concurrent life sentences for the first-degree murder of Lisa Rainey and Arialle Shelton, and the attempted first-degree murder of Ronnie Lee Rainey, Jr. In addition, it imposed a concurrent term of 25 years for the first-degree assault of Kevin James; as well as four concurrent terms of 20 years each for use of a handgun in the commission of a crime of violence. Remaining lesser included offenses were merged.

Although we conclude that the circuit court erred in admitting into evidence the testimonial statements of a non-testifying expert, the resulting error was harmless, and we therefore affirm.

**BACKGROUND**

Rainey and his wife, Lisa Renee Rainey, were having marital difficulties. On Sunday, May 12, 2013, following a domestic dispute, Lisa Rainey, accompanied by her children, Arialle Shelton (Rainey's stepdaughter) and Ronnie Lee Rainey, Jr. (Rainey's son, hereafter "R.J."), left the family home in Laurel, Maryland and sought refuge in a nearby hotel.

The next morning, Rainey sent a text message to Lisa, informing her that he was leaving the family home. Believing that Rainey was not there, Lisa and her children returned home to pick up clothes for R.J. and to check on the family dog. As a precaution, Arialle called her friend, Kevin James, and asked him to meet them at the family home and verify that Rainey was not there.[3]

James arrived first and, upon observing that Rainey's car was not parked in front of the home, informed Arialle, by phone, that it was safe to proceed. He had second thoughts, however, and went to the back of the home, where he saw Rainey's vehicle. James then ran towards Arialle and the other family members and warned them that "[s]omething [was] wrong" and that they should return to their vehicle, but his warning was too late—by then, Rainey had emerged from the house, brandishing a handgun.

---

[3] James was a police officer "working with the warrant unit." He was not involved in the investigation of this case.

2

Rainey pointed the weapon at James while ordering the others to come inside the house. Rainey's family members attempted to return to Arialle's car, but Rainey turned and pointed his gun at them and repeated his order that they come inside. Meanwhile, James escaped by climbing over a fence.

Lisa, Arialle, and R.J. complied with Rainey's order and entered the house. Once they were inside, Rainey ordered them into the living room. Lisa and Arialle sat down on a couch, and R.J. stood behind them. Rainey and Lisa then engaged in a "conversation" about the events of the preceding day. According to R.J., Rainey asked how was he "supposed to feel comfortable," and Lisa explained why she had left and not immediately returned. Then, the "back and forth" concluded, and Rainey declared, "Before I lose y'all, I would rather just take y'all," whereupon he shot and killed Lisa and Arialle and shot at R.J. but missed, striking his cap instead. R.J. fled out the back door and ran to a neighbor's house.

Just before 10:00 a.m. that morning, a Prince George's County 911 dispatcher received a call, placed by Rainey, informing the dispatcher that he had just shot his wife and his stepdaughter and had attempted to shoot his son at their home. Rainey further told the dispatcher that he intended to shoot himself.

Prince George's County Police Officers responded to that call and created a perimeter around Rainey's home. Rainey eventually surrendered, whereupon police officers entered the home and found Lisa Rainey and Arialle Shelton, in the living room, both deceased, with gunshot wounds to the head.

3

Rainey was arrested and transported to the Criminal Investigation Division of the Prince George's County Police Department. During that trip, he admitted that he had killed his wife and stepdaughter. Upon arriving at the police station, he was administered *Miranda*[4] advisements, and he thereafter gave a recorded statement, once again admitting that he had killed Lisa and Arialle. The police recovered Rainey's cell phone and discovered a 28-minute-long message that Rainey had recorded the previous evening, stating that he would take Lisa and himself "out" before he would allow her to leave him.

On June 4, 2013, an indictment was returned, in the Circuit Court for Prince George's County, charging Rainey with first- and second-degree murder of both Lisa Rainey and Arialle Shelton; attempted first- and second-degree murder, and first- and second-degree assault, of Ronnie Lee Rainey, Jr.; first- and second-degree assault of Kevin James; and four counts of use of a handgun in the commission of a crime of violence, one for each victim. Ten days later, Rainey, through counsel, filed a motion seeking permission to be examined by a defense expert, Thomas Hyde, M.D., to determine whether he was competent to stand trial. That motion was granted, and, after Rainey had been examined by both Dr. Hyde and a State expert, a hearing was held, in February 2014, to determine whether he was competent to stand trial. The circuit court found that he was not and ordered that Rainey be committed to the Clifton T. Perkins Hospital Center.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

While at Perkins, Rainey "was referred for a psychological evaluation" to include "diagnostic clarification, personality functioning, and the presence or absence of psychotic symptoms and cognitive disabilities." During that evaluation, Rainey was given several psychological tests: a "Structured Inventory of Malingered Symptomatology" ("SIMS"); a "Structured Interview of Reported Symptoms, 2nd Edition" ("SIRS-2"); a "Test of Memory Malingering" ("TOMM"); and a "Personality Assessment Inventory" ("PAI"). A report was prepared, dated November 20, 2014 and signed by two psychologists, Aryeh Kanal, Psy.D., a psychology associate doctorate, and G.S. Marshall Cowan, III, Psy.D., the supervising psychologist. According to the report (hereafter "Kanal report"), Rainey's scores "varied" on tests of malingering, but, in the opinion of the authors, "it would appear that Mr. Rainey's reported symptoms are in fact feigned or exaggerated, but that he is not likely to exaggerate psychotic or unusual symptoms in other domains of functioning."

Eventually, Rainey was found competent to stand trial. Then, in September 2015, Rainey, through counsel, filed a written plea of not criminally responsible. He ultimately reached a plea agreement, whereby he would plead to having committed the actus reus of every offense charged in the indictment, while reserving the issue of his criminal responsibility for a jury trial.

In 2017, a five-day trial was held on the issue of criminal responsibility. The defense called two witnesses: Paul Smith, Rainey's neighbor at the time of the killings; and Dr. Hyde, Rainey's medical expert.

Smith, who lived across the street from Rainey, testified that, on May 11, 2013, two days before the killings, he had observed Rainey walking his dog. Shortly thereafter, he heard a "loud noise," which he recognized was a lightning strike. Smith went outside to investigate whether there had been any damage to his property and discovered that a tree in his yard had been struck by lightning. Rainey was outside when Smith ventured out, and Smith spoke with him "briefly." Although he did not notice "anything wrong with" Rainey, Smith testified that Rainey "might have mentioned that he was struck, but he [couldn't] recall."

Dr. Hyde, a neuroscientist and behavioral neurologist, who was admitted as an expert "in the field of neurology and psychiatry for the purpose of testifying as to criminality," testified that he had examined Rainey four separate times over a two-year period. In addition to those examinations, he had further examined the materials provided by the State in discovery, including various recordings and videos, as well as notes and reports, and he had also interviewed Rainey's former wife, Patricia Rainey. After considering that information, Dr. Hyde opined that Rainey suffered from a traumatic brain injury induced by the lightning strike that had occurred two days before the killings. Consequently, in Dr. Hyde's opinion, Rainey was not criminally responsible. Dr. Hyde further opined that Rainey was not malingering, stating that he had found no "evidence of that upon [his] examination of" Rainey. Dr. Hyde conceded, however, that his opinion was based largely upon Rainey's self-reported symptoms and that he had observed no "evidence of trauma, deformity or scarring" when examining Rainey's head.

6

The State presented testimony of Lisa Rainey's mother, Velma Cook; R.J.; James; and its psychiatric expert, Annette Hanson, M.D. The testimony of R.J. and James, the only survivors of the shootings, was summarized previously; we shall briefly outline the testimony of the others as relevant to this appeal.

Ms. Cook testified that, on May 13, 2013, that is, the day of the killings, Rainey called her and said, "I am going to kill your daughter and I am going to kill myself." He then hung up. Cook tried to call back but "couldn't get an answer." Phone records indicated that Rainey had placed that call at 9:55 a.m. and that he placed the ensuing "911" call less than a minute later.

Prior to Dr. Hanson's testimony, the defense moved in limine to preclude her from testifying about the results of the tests described in the Kanal report, on confrontation grounds. Then, while defense counsel examined her outside the presence of the jury, Dr. Hanson acknowledged, among other things, that she neither performed any of the tests described in the Kanal report, nor did she observe the raw data generated from those tests; and, furthermore, that, as to two of the three tests administered to Rainey, had she been provided with the underlying data, she would not have been qualified to analyze it. The circuit court, nonetheless, denied the motion in limine, ruling that Dr. Hanson could testify about the tests because they were data "of a type reasonably relied upon by experts

in the particular field in forming opinions or inferences upon the subject[.]" Md. Rule 5-703(a).[5]

Dr. Hanson thereafter testified before the jury. After being qualified as an expert in the area of forensic psychiatry, she testified at length about her ultimate conclusion, that Rainey was criminally responsible for the crimes at issue. Among other things, she briefly mentioned that Rainey, while confined at Perkins after initially being found not competent to stand trial, had been administered three psychological tests to determine whether he was malingering and that, according to the Kanal report, two of those three tests indicated that he was.

By far, the greater part of Dr. Hanson's testimony concerned all the reasons she believed that Rainey should be found criminally responsible, including the "very unusual" symptoms Rainey reported; that Rainey had not been taking anti-psychotic medications until one week prior to being transferred to Perkins, which, she opined, "is quite unusual for someone with a serious mental illness"; that, once admitted to Perkins, his medication was stopped (because the purpose of his stay there was "to clarify his diagnosis") and that, while "receiving no treatment" whatsoever, he nonetheless "did very well there"; that, once Rainey had been diagnosed and his medications resumed, none of the medications helped to alleviate any of his reported symptoms; that, during his

---

[5] Effective July 1, 2019, Rule 5-703 was amended to conform more closely to Federal Rule of Evidence 703. Rules Order, May 16, 2019 (available at https://www.mdcourts.gov/sites/default/files/rules/order/ro200.pdf) (last visited Dec. 10, 2019). Throughout this opinion, all references to Rule 5-703 are to the version in effect at the time of Rainey's trial.

stay at Perkins, Rainey was "very well behaved" and "a model patient," which is not "an easy thing to do at Perkins"; and that, once discharged from Perkins, Rainey was not prescribed any medication because he had been "assessed as not having a mental disorder." In addition, Dr. Hanson criticized Dr. Hyde's methodology and disagreed with the conclusions stated in his report, which were favorable to Rainey, noting that Dr. Hyde had, according to Dr. Hanson, "relied solely upon" Rainey's word without considering the "information that collaterals provided." She also downplayed Rainey's reports that he had been suffering from delusional parasitosis because his purported symptoms were "inconsistent" with the confirmed cases she had observed in her two decades of work with "psychotic killers" and "violent offenders."

Finally, Dr. Hanson discussed the statement that Rainey had recorded on his cell phone early in the morning of May 13, just eight hours before the shootings, which she characterized as a "confession" and "the strongest evidence" of Rainey's criminal responsibility. In that recorded statement, Rainey "talked about his anger at his wife, the fact that he had been . . . mistreated over the years by more than one woman," and that "he wasn't going to take it anymore." Rainey further stated that he was "leaving [his] telephone unlocked for investigators," a clear signal to Dr. Hanson that Rainey was able to "appreciate criminality." Moreover, in his "911" call, Rainey stated that "he was going to kill himself rather than go to court," again indicating that "he knew that he was going to be facing criminal prosecution immediately after the crime." Then, while speaking to police officers afterwards, Rainey "had enough awareness of the criminality of his conduct that he offered an alternative explanation for the offense," stating that "he

9

didn't remember shooting at the victims" and that "he was shooting at the shadow of someone who he thought was coming into the house."

On the fifth day of the proceedings, the case went to the jury. After deliberating for less than two hours,[6] it returned its verdict, finding Rainey criminally responsible for the crimes charged. After sentence was imposed, Rainey noted this appeal.

## DISCUSSION

### I. Standard of Review

"We review the ultimate question of whether the admission of evidence violated a defendant's constitutional rights without deference to the trial court's ruling." *Taylor v. State*, 226 Md. App. 317, 332 (2016) (citing *Hailes v. State*, 442 Md. 488, 506 (2015)).

### II. Legal Framework

### A. The Confrontation Clause, "Testimonial Hearsay," and the "Primary Purpose" Test

The Sixth Amendment, applicable to the states through the Fourteenth Amendment, guarantees that, in "all criminal prosecutions," an accused "shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. Amend. VI. How that guarantee is interpreted and enforced has sharply divided the Supreme Court, in the years since its seminal decision in *Crawford v. Washington*, 541 U.S. 36 (2004).

In *Crawford*, the Supreme Court sought to reconnect the application of the Confrontation Clause to its original meaning and held that, regardless of hearsay rules,

---

[6] This is a generous estimate. The jury recessed for lunch at 12:14 p.m. and reconvened at 2:08 p.m., by which time it had already reached a verdict.

10

the Confrontation Clause generally bars the introduction into evidence, at a criminal trial, of "testimonial hearsay," unless the defendant had a prior opportunity to cross-examine the declarant, and the declarant was presently unavailable to testify. 541 U.S. at 54. The statement at issue in *Crawford*, which was recorded during a police interrogation of Crawford's wife (who was unavailable to testify because of the spousal privilege) and played back at his trial, was indisputably a "testimonial" statement, and the *Crawford* Court thus had no occasion to offer a precise definition of that term. *Id.* at 68. The Court did, however, set forth what it called a "core class" of such statements, namely, affidavits, depositions, prior testimony, and confessions. *Id.* at 51-52.

Two years later, in two consolidated cases, *Davis v. Washington* and *Hammon v. Indiana*, 547 U.S. 813 (2006), the Court further refined the definition of "testimonial" statement by articulating what it called the "primary purpose" test:

> [Statements] are testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822. In contrast,

> [s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.

*Id.* But, cautioned the Court, its holding referred to "interrogations" because the statements at issue in those cases were "the products of interrogations," and it did not

11

mean to suggest "that statements made in the absence of any interrogation are necessarily nontestimonial." *Id.* at 822 n.1.

## B. Application of the "Primary Purpose" Test to Scientific or Forensic Reports

How the "primary purpose" test applies to scientific or forensic reports has been the subject of three Supreme Court decisions rendered since *Davis* and *Hammon*: *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), and *Williams v. Illinois*, 567 U.S. 50 (2012). We now briefly summarize the holdings in those cases.

In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, the Court held, in a 5-4 decision, that "certificates of analysis," sworn to before a notary public, which attested to the weight and chemical composition of purported drugs seized from Melendez-Diaz, *id.* at 308, fell within the "core class of testimonial statements." *Id.* at 310. Accordingly, it concluded that such certificates could not be introduced into evidence at Melendez-Diaz's criminal trial without the testimony of the analysts who had performed the tests. *Id.* at 311.

Two years later, in *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), the Court held, again in a 5-4 decision, that an unnotarized "Report of Blood Alcohol Analysis," which attested to the blood alcohol content measured in Bullcoming's blood sample, as well as its chain of custody, and which certified that the analyst had followed the "established procedure" for handing and testing that sample, *id.* at 653, was nonetheless a "testimonial" statement, despite being "unsworn." *Id.* at 664-65. Furthermore, because, at Bullcoming's criminal trial, the State introduced the report, not through the testimony

12

of the analyst who had performed the test, but instead, through the testimony of a "surrogate" analyst, who had neither signed the certification nor performed or observed the test that it reported, *id.* at 652, the Supreme Court held that the Confrontation Clause had been violated. *Id.* at 659-61.

But, in *Williams v. Illinois*, 567 U.S. 50 (2012), the most recent of those decisions, the Court made an abrupt departure from *Melendez-Diaz* and *Bullcoming* and upheld a rape conviction, where an expert witness had been permitted to testify at Williams's trial that his DNA had been detected through forensic testing of a rape kit obtained from the victim, despite the fact that the witness had neither performed the testing herself nor even been employed by the facility, Cellmark Diagnostics Laboratory, which had. The fractured 4-1-4 decision in *Williams* resulted in three different tests for determining whether a scientific or forensic report is "testimonial."

A plurality of four justices, the dissenters in *Melendez-Diaz* and *Bullcoming*, joined an opinion by Justice Alito, announcing the judgment of the Court, which stated that, to implicate the Confrontation Clause, not only must a statement, such as a forensic laboratory report, have been prepared for the "primary purpose of creating an out-of-court substitute for trial testimony," *Williams*, 567 U.S. at 84 (Alito, J., plurality opinion) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)),[7] but it must have "had

---

[7] The quoted passage from *Bryant* emphasized that "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011).

13

the primary purpose of accusing a targeted individual." *Id.* at 83. According to the plurality, the Cellmark report did not satisfy that test since, at the time the report had been prepared, there was no known suspect in the case. *Id.* at 85-86. Rather, insisted the plurality, the primary purpose of the Cellmark report "was to catch a dangerous rapist still at large," and that report therefore did not qualify as a "testimonial" statement. *Id.* at 84.[8]

The fifth concurring justice, Justice Thomas, voted with the Alito plurality but disagreed entirely with its rationale. *Id.* at 104 (Thomas, J., concurring in the judgment) ("As I explain below, I share the dissent's view of the plurality's flawed analysis."). Justice Thomas rejected Justice Alito's "targeted" "primary purpose" test, *id.* at 114-118, asserting that it "lacks any grounding in constitutional text, in history, or in logic." *Id.* at 114. In its place, Justice Thomas proposed his own idiosyncratic test, to which no other justice ascribed, namely, that to qualify as "testimonial," an out-of-court statement must bear "indicia of solemnity." *Id.* at 111. Applying that test, Justice Thomas concluded that the Cellmark report, though signed by two "reviewers," *id.* at 111, was "neither a sworn nor a certified declaration of fact." *Id.* Therefore, according to Justice Thomas, the Cellmark report "lacked the requisite 'formality and solemnity' to be considered 'testimonial' for purposes of the Confrontation Clause." *Id.* at 104 (citation omitted).

---

[8] The plurality further concluded that the Cellmark report had not been admitted for its truth and was, therefore, not hearsay. *Williams*, 567 U.S. at 70-79 (Alito, J., plurality opinion). Five justices, however, emphatically disagreed with that conclusion, *id.* at 106-07 (Thomas, J., concurring in the judgment); *id.* at 126 (Kagan, J., dissenting), and it was not part of the Court's holding.

14

The four dissenting justices proposed yet a different test for determining whether a forensic report is a "testimonial" statement. According to the dissenters, "a statement meant to serve as evidence in a potential criminal trial," such as the Cellmark report, should be deemed "testimonial." *Id.* at 138 (Kagan, J., dissenting).

Lower courts have struggled to apply *Williams* in cases where the prosecution attempts to introduce scientific or forensic reports into evidence, or, as here, introduces their substance through expert testimony. The Supreme Court has provided a rule of decision for a case, such as *Williams*, in which there is no majority opinion:

> When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.

*Marks v. United States*, 430 U.S. 188, 193 (1977) (citation and quotation omitted).

The method prescribed in *Marks*, however, rests upon the presumption that there is a common point of agreement among the rationales in support of the judgment. *See King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (observing that "*Marks* is workable—one opinion can be meaningfully regarded as 'narrower' than another—only when one opinion is a logical subset of other, broader opinions"). Arguably, in *Williams*, that presumption does not obtain, leading several lower courts to conclude that *Marks* does not yield a holding when applied to *Williams* and that therefore *Williams* has no precedential value beyond its facts. *See*, *e.g.*, *United States v. Duron-Caldera*, 737 F.3d 988, 994 n.4 (5th Cir. 2013); *United States v. James*, 712 F.3d 79, 95 (2d Cir. 2013); *State v. Watson*, 185 A.3d 845, 855-56 (N.H. 2018); *State v. Stanfield*, 347 P.3d 175, 184

15

(Idaho 2015); *State v. Michaels*, 95 A.3d 648, 665-66 (N.J. 2014); *State v. Kennedy*, 735 S.E.2d 905, 919-20 (W.Va. 2012). Departing from the reasoning of those courts, the Court of Appeals has, nonetheless, attempted to apply *Marks* to divine a rule of decision from the opinions in *Williams* which, together, resulted in the judgment, and we turn to its most recent exposition on the matter, *State v. Norton*, 443 Md. 517 (2015).

In *Norton*, the Court of Appeals looked to a then-recent decision of the District of Columbia Court of Appeals, *Young v. United States*, 63 A.3d 1033 (D.C. 2013), which had considered *Marks*'s applicability to *Williams*. The *Young* Court observed that, although there was no commonality between the tests articulated by Justices Alito and Thomas, each test could be regarded as a narrowing of the test advanced by Justice Kagan in her dissenting opinion. *Young*, 63 A.3d at 1043. That insight led the *Young* Court to conclude that, under *Williams*, a forensic report should be deemed testimonial if it satisfies "the basic 'evidentiary purpose' test espoused by Justice Kagan" and, additionally, *either* Justice Alito's "targeted accusation test" *or* Justice Thomas's "formality criterion." *Id.* at 1043-44. The Court of Appeals adopted *Young*'s test, *Norton*, 443 Md. at 546-48, and we therefore are bound to apply that test to the reports at issue in the instant case.

## C. An Antecedent Question: The Relationship Between Maryland Rule 5-703 and the Confrontation Clause

Before a court applies the foregoing analysis to determine whether a scientific or forensic report is "testimonial," it must first answer a predicate question—whether the report is hearsay. That is because the Confrontation Clause applies only to "testimonial

16

hearsay." *Davis*, 547 U.S. at 824. If, as in the instant case, the prosecution does not call the author of the report to testify, the question then becomes whether the report is being offered for its truth because, if so, it constitutes hearsay. Md. Rule 5-801(c).

Maryland Rule 5-703, the rule governing expert testimony, seemingly offers the State a way to circumvent this problem. That rule permits an expert to base her testimony on facts that are otherwise inadmissible, if those facts are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject[.]" Md. Rule 5-703(a).[9] Moreover, in the court's discretion, such facts may be disclosed to the jury, if "determined to be trustworthy, necessary to illuminate testimony, and unprivileged[.]" Md. Rule 5-703(b). However, "[u]pon request, the court shall

_____

[9] At the time of Rainey's trial, Rule 5-703 provided as follows:

> **(a) In General.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
>
> **(b) Disclosure to Jury.** If determined to be trustworthy, necessary to illuminate testimony, and unprivileged, facts or data reasonably relied upon by an expert pursuant to section (a) may, in the discretion of the court, be disclosed to the jury even if those facts and data are not admissible in evidence. Upon request, the court shall instruct the jury to use those facts and data only for the purpose of evaluating the validity and probative value of the expert's opinion or inference.
>
> **(c) Right to Challenge Expert.** This Rule does not limit the right of an opposing party to cross-examine an expert witness or to test the basis of the expert's opinion or inference.

17

instruct the jury to use those facts and data only for the purpose of evaluating the validity and probative value of the expert's opinion or inference." Md. Rule 5-703(b).

A literal reading of the rule would suggest that a trial court may permit an expert to testify about testimonial statements of a non-testifying witness and, subject to a limiting instruction, disclose those statements to a jury. But plainly, no rule or statute can override a constitutional command, and, as we shall explain, both the Court of Appeals and the Supreme Court have so held. Thus, the general rule stated in part (a) does not apply if the otherwise inadmissible evidence amounts to "testimonial hearsay," nor does part (b) of the rule, which admits otherwise inadmissible evidence "only for the purpose of evaluating the validity and probative value of the expert's opinion or inference," that is, for a purportedly non-hearsay purpose, exempt such expert testimony from the ambit of the Confrontation Clause.

In a pre-*Williams* decision, *Derr v. State*, 422 Md. 211 (2011) ("*Derr I*"), *vacated*, 567 U.S. 948 (2012), *overruled by* 434 Md. 88 (2013) ("*Derr II*"), *cert. denied*, 573 U.S. 903 (2014), the Court of Appeals addressed this very question and held that, "because of the Confrontation Clause, an expert may not render as true the testimonial statements or opinions of others through his or her testimony." *Id.* at 243. When it reconsidered Derr's appeal following remand from the Supreme Court, the Court of Appeals had no need to reconsider that part of its holding in *Derr I*, because, applying its interpretation of

*Williams*,[10] it held that the forensic reports at issue were not "testimonial." *Derr II*, 434 Md. at 117-20.

Furthermore, in *Williams* itself, a majority of the Supreme Court rejected the notion that an analogous state-law rule, Illinois Rule of Evidence 703, would permit an expert to offer such "basis testimony" without regard for the Confrontation Clause. In his opinion concurring in the judgment, Justice Thomas observed that "concepts central to the application of the Confrontation Clause are ultimately matters of federal constitutional law that are not dictated by state or federal evidentiary rules," *Williams*, 567 U.S. at 105 (Thomas, J., concurring in the judgment) (citation omitted), and he concluded that "[t]here is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth." *Id.* at 106. Likewise, Justice Kagan, in an opinion joined by three other justices, declared that "when a witness, expert or otherwise, repeats an out-of-court statement as the basis for a conclusion," such a "statement's utility is then dependent on its truth," and it follows that the prosecution cannot "rely on [the testifying expert's] status . . . to circumvent the Confrontation Clause's requirements." *Id.* at 126 (Kagan, J., dissenting). Under *Marks*, these harmonious statements from Justice

---

[10] *Derr II* applied a different test (based solely upon Justice Thomas's concurring opinion in *Williams*) to the admissibility of forensic reports than that subsequently articulated in *Norton*, but the latter test supersedes the test adopted in *Derr II* and is the test currently applied in Maryland. *See Norton*, 443 Md. at 545-46 (observing that "no other state supreme court nor federal circuit court of appeals" had applied the test adopted by the Court of Appeals in *Derr II* and thus taking the "opportunity to better refine [its] own analysis").

Thomas's concurring opinion and Justice Kagan's dissenting opinion may be regarded as a holding of the Court as to this question.[11]

We therefore conclude that, when Maryland Rule 5-703 and the Confrontation Clause are in apparent conflict, the rule must give way to the constitutional requirement. Thus, the rule permits an expert to testify about otherwise inadmissible evidence if it is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," Md. Rule 5-703(a), but only if that otherwise inadmissible evidence is not "testimonial hearsay." Moreover, when "basis evidence" is "testimonial,"

---

[11] Because the Supreme Court has only indirectly addressed this issue, lower courts are in disagreement as to whether the prosecution may evade the Confrontation Clause through use of the rules governing testimony by expert witnesses. *Compare People v. Sanchez*, 374 P.3d 320, 334-35 (Cal. 2016) (concluding that, when "any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay"); *Martin v. State*, 60 A.3d 1100, 1107 (Del. 2013) (observing that, in *Williams*, "five U.S. Supreme Court Justices, in concurrence and dissent, found that the underlying [Cellmark] report was admitted for the truth of the matter asserted") *with State v. Roach*, 95 A.3d 683, 695-96 (N.J. 2014) (holding that an "independent reviewer" may, consistently with the Confrontation Clause, "testify based on his or her independent review of raw data and conclusions that he or she reports based on that data"); *Com. v. Greineder*, 984 N.E.2d 804, 818 (Mass. 2013) (permitting a "bifurcated approach," that is, admitting an expert's opinion but "excluding its hearsay basis on direct examination"); *People v. Williams*, 939 N.E.2d 268, 278-80 (Ill. 2010) (holding that expert "testimony about Cellmark's report was not admitted for the truth of the matter asserted" but, "rather, to show the underlying facts and data [the expert] used before rendering" her opinion), *aff'd sub nom. Williams v. Illinois*, 567 U.S. 50 (2012). Although we are not bound by *Derr I*, as that decision was vacated in its entirety by the Supreme Court, albeit on different grounds, *see West v. State*, 369 Md. 150, 157-58 (2002), we nonetheless find it persuasive, and, moreover, we interpret *Williams* as precluding such a "prosecutorial dodge." 567 U.S. at 120 (Kagan, J., dissenting).

part (b) of the rule does not permit an expert to act as a conduit for such evidence, regardless of the text of the rule.

## III. Analysis

During the proceedings below, the circuit court permitted Dr. Hanson to testify, over defense objection, about the results of the psychological tests, as described in the Kanal report, because such matters were "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject" under Rule 5-703. Neither the psychologist who had administered the psychological tests at issue, nor the supervising psychologist, who also had signed the report, was called to testify. As we have previously explained, such "basis evidence" could properly be admitted over a confrontation objection only if the results of those tests were not "testimonial hearsay," a question we now consider.

### A. Application of the *Norton* Test

In addressing a claimed Confrontation Clause violation based upon the alleged admission of testimonial hearsay, we begin by determining whether the out-of-court statements at issue constituted hearsay and, if so, whether such hearsay was "testimonial" under the test espoused by *Norton*.[12]

---

[12] Under *Crawford*, "[t]estimonial statements of witnesses absent from trial" are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. at 59. In the instant case, neither of those conditions, the declarant's unavailability or the defendant's prior opportunity to cross-examine, was established, and thus neither is relevant to our analysis.

21

Initially, we reject the State's suggestion that, because the Kanal report itself "was not admitted at trial," there was no confrontation issue, since Dr. Hanson, the expert who testified about its conclusions, was available for cross-examination. As five justices agreed in *Williams*, "[t]here is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth." *Id.* at 106 (Thomas, J., concurring in the judgment); *see id.* at 126-27 (Kagan, J., dissenting) (rejecting the idea that "'basis evidence' comes in not for its truth, but only to help the factfinder evaluate an expert's opinion"). In the instant case, as in *Williams*, Dr. Hanson served as a conduit for the results of the malingering tests, and we conclude that those results were introduced, through her testimony, for their truth and were therefore hearsay.

We next consider whether the hearsay at issue was "testimonial." Applying the test articulated in *Norton*, we must determine whether the Kanal report, summarizing the results of the malingering tests, was prepared for an evidentiary purpose, and, if so, whether it was either "formal" or "targeted." For ease of exposition, we begin by examining whether the Kanal report bears "indicia of solemnity" sufficient to satisfy Justice Thomas's "formality" test, and then consider the "evidentiary purpose" and "targeted accusation" tests together.

Although the Kanal report is signed by two psychologists, it is not notarized, nor does it certify that the tests were administered according to any specific protocol. In these respects, the Kanal report is similar to the Cellmark report in *Williams*, which, likewise, though signed by two "reviewers," was "neither a sworn nor a certified

22

declaration of fact" and lacked any "attest[ation] that its statements accurately reflect[ed] the DNA testing processes used or the results obtained." *Williams*, 567 U.S. at 111 (Thomas, J., concurring in the judgment). Like the Cellmark report, the report at issue here "certifies nothing." *Id.* at 112. Accordingly, because the Kanal test report lacks sufficient "indicia of solemnity," *id.*, we conclude that it does not satisfy Justice Thomas's "formality criterion," *Young*, 63 A.3d at 1044, and is therefore, under that test, not "testimonial."

We next consider whether the Kanal report satisfies Justice Kagan's "evidentiary purpose" test and Justice Alito's "targeted accusation" test. Because that report does not satisfy Justice Thomas's "formality criterion," it must satisfy both of the remaining tests to qualify as "testimonial."

In its header, the report indicates that it was prepared under the auspices of the Clifton T. Perkins Hospital Center. Perkins is a "Maximum Security facility," established by statute[13] as part of the Maryland Department of Health, which "receives patients requiring psychiatric evaluation who have been accused of felonies and have raised the Not Criminally Responsible (NCR) defense and/or their Competency to Stand Trial is in question." Clifton T. Perkins Hospital Home, available at https://health.maryland.gov/perkins/Pages/home.aspx (last visited Dec. 11, 2019). Just below the header, the report indicates the subject's name, date of birth, age, the dates of

---

[13] See Maryland Code (1982, 2009 Repl. Vol.), Health-General Article, § 10-406(a)(1), which was in effect at the time the Kanal report was issued. The current version of the statute, in the 2019 replacement Volume, is to similar effect.

the assessment, the criminal charges against him, the case number, and the "Current Legal Status," which was, as of the date of the report, incompetent to stand trial ("IST"). Then, in its second full paragraph, the report includes a "Non-Confidentiality Statement":

> Mr. Rainey was informed at the outset of each evaluative session of the voluntary and non-confidential nature of the evaluation. **He was informed that all information gathered during this evaluation had the potential to be included in a report that would be placed in his hospital chart and would be available to clinical staff. He understood that his chart could be subpoenaed in legal actions.** Mr. Rainey understood the non-confidentiality of the evaluation and its voluntary nature, and agreed to participate.

(Emphasis added.)

On its face, the Kanal report indicates an evidentiary purpose and that it "could be subpoenaed in legal actions." To say, as the State maintains, that the primary purpose of this report and of the malingering tests "was to aid in [Rainey's] diagnosis and treatment, not to accuse him of crime[s]," is to ignore reality.[14] In determining whether there was an evidentiary purpose, we must bear in mind that Rainey's mental condition was essentially the only issue in his criminal trial. A person committed to Perkins is not merely undergoing medical or psychiatric treatment; the entire raison d'être of that facility is, in the words of its website, to "receive[] patients requiring psychiatric evaluation who have been accused of felonies and have raised the Not Criminally Responsible (NCR) defense and/or their Competency to Stand Trial is in question." It goes without saying that the medical purpose and the evidentiary purpose of any ensuing treatment received by such a

---

[14] Indeed, one might say, without irony, that the State's argument embodies a classic case of "We're from the government, and we're here to help you!"

patient substantially overlap. In other words, given the centrality of Rainey's psychological condition to his criminal case, there is no meaningful distinction between the medical or therapeutic purpose of the Kanal report and its potential evidentiary purpose. We conclude that the Kanal report satisfies the Kagan "evidentiary purpose" test.

Moreover, not only does this report have an evidentiary purpose, it is a purpose that is plainly targeted at the defendant, Ronnie Lee Rainey, Sr. The report expressly lists the defendant's name, the charges alleged, and the case number assigned by the circuit court. The report's conclusion, "that Mr. Rainey's reported symptoms are in fact feigned or exaggerated," is, in the context of this case, tantamount to an accusation that he indeed committed the crimes charges. *See Norton*, 443 Md. at 548 (observing that a forensic document, to be "testimonial" under the Alito test, "must contain a conclusion that connects the defendant to the underlying crime"). We hold that the Kanal report satisfies the Alito "targeted accusation" test. And, because the Kanal report satisfies both the Kagan "evidentiary purpose" test and the Alito "targeted accusation" test, it is therefore "testimonial." *Young*, 63 A.3d at 1043-44; *Norton*, 443 Md. at 547.

It follows that the circuit court erred in permitting Dr. Hanson to testify about the conclusions reached in that report, since neither of its signatories, Dr. Kanal nor Dr. Cowan, was called to testify.[15] We therefore must determine whether that error was

---

[15] This might be a different case if Dr. Hanson had offered a truly independent conclusion regarding the test results from the Kanal report, and, indeed, as she otherwise did in the remainder of her testimony. Although "an expert's use of testimonial hearsay
(continued)

25

harmless.  *Delaware v. Van Arsdall*, 475 U.S. 673, 680-84 (1986) (holding that violations of the Confrontation Clause are amenable to *Chapman* harmless error[16] analysis).

## B.  Harmless Error

Harmless error review is the standard "most favorable to the defendant short of an automatic reversal."  *Bellamy v. State*, 403 Md. 308, 333 (2008).  That standard must be applied "in a manner that does not encroach upon the jury's judgment."  *Dionas v. State*, 436 Md. 97, 109 (2013) (citing *Bellamy*, 403 Md. at 332).  "[H]armless error factors must be considered with a focus on the effect of erroneously admitted, or excluded, evidence on the jury."  *Id.*  Among the factors that should be considered are "the nature, and the effect, of the purported error upon the jury," *id.* at 110; "the jury's behavior during deliberations," including the length of those deliberations, *id.*; and the strength of the State's case, "from the perspective of the jury."  *Id.* at 116.

---

(continued)

is a matter of degree," and the Confrontation Clause may not always forbid an expert witness from testifying "merely because" her opinions "were in some part informed by their exposure to otherwise inadmissible evidence," it does bar testimony where an expert witness "is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation."  *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009) (citation omitted).

[16] Under federal law, only preserved errors of constitutional dimension are subject to the harmless error standard articulated in *Chapman v. California*, 386 U.S. 18, 24 (1967), that is, that reversal is mandated unless the State can demonstrate "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Under Maryland law, all preserved errors, whether "of constitutional significance or otherwise," are subject to the *Chapman* standard.  *Dorsey v. State*, 276 Md. 638, 659 (1976).

We begin with the observation that Dr. Hanson authored a fifty-six-page report on Rainey's criminal responsibility, in which she relied upon forty-eight sources of information in making her own assessment. Those sources included, in Dr. Hanson's words, "collateral interviews with witnesses"; interviews "with the defendant himself"; interviews with "the defendant's two sisters" and "his brother"; "medical records" and "investigation materials"; "court orders and motions"; and "miscellaneous documents such as text and telephone conversations between the defendant and his victims." Because she testified at trial and was available for cross-examination, her own analysis was properly admitted without implicating the Confrontation Clause. But, in preparing her report, she also relied upon the Kanal report, summarizing the results of three malingering tests[17] that had been administered by a psychologist, Dr. Aryeh Kanal, who was not called to testify; moreover, during direct examination, she testified that, "in two of those three tests, the assessment was that [Rainey] was malingering his symptoms."

As for the erroneously admitted testimony itself, which comprised less than a page of the 75-page transcript of Dr. Hanson's testimony, we note that it was not entirely inculpatory. As Dr. Hanson acknowledged, one of the three psychological test results

---

[17] Dr. Kanal's report summarized the results of four tests, which had been administered to Rainey, but only three of those tests, which sought to determine whether he had been malingering, are at issue.

indicated that Rainey was *not* malingering.[18]  That alone, of course, would not be enough for us to conclude that the error was harmless.  But there was more.

For one thing, Dr. Hanson explained, in considerable detail and based upon admissible evidence, why she discounted Rainey's claimed mental illness.  That evidence was overwhelming;[19] among other things, Rainey thrived at Perkins while receiving no anti-psychotic medication, and, upon discharge, he was prescribed no such medication because he was deemed not to suffer from a mental illness.

The most important factor, by far, was Rainey's planning and deliberation of the crimes.  Dr. Hanson pointed this out in describing Rainey's recorded "confession," on his cell phone, made eight hours before the shootings.  As the sentencing court aptly noted, "the one piece of evidence or fact that jumped out" was "the manner in which [Rainey] parked his vehicle behind his house."  The court further drew the only reasonable inference possible—that Rainey "parked his vehicle out of sight so it would not be seen by the victims in this case."  Given this incontrovertible evidence of an ambush, it was

---

[18] We further note that there was no contemporaneous objection at the time Dr. Hanson testified about the results of the psychological tests.  Moreover, the defense did not request a continuing objection when, just prior to Dr. Hanson's testimony, the court denied the defense's motion in limine seeking to preclude Dr. Hanson from testifying about the results of the tests.  But the State has not raised preservation, and, given the close proximity in time between the denial of the motion in limine and the disputed testimony, we assume that the issue is properly before us.

[19] In *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), the Supreme Court expressly noted that an important factor in determining whether error is harmless is "the overall strength of the prosecution's case."  *Id.* at 684 (citations omitted).

"clear" to the court, and no doubt to the jury as well, that Rainey had "planned" the killings and that he therefore was criminally responsible.

Finally, the jury deliberated for an exceedingly short time before returning its verdict, which suggests that it did not think this was at all a close case. *See Dionas*, 436 Md. at 110 (noting the significance of the jury's behavior during deliberation and the length of that deliberation). Under these circumstances, we conclude, beyond a reasonable doubt, that the confrontation error in this case had no influence on the verdict. Accordingly, we affirm the judgment.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS ASSESSED TO APPELLANT.**

29